**GLOBE NEWSPAPER COMPANY,
et al., Plaintiffs—Appellees,**

v.

**BEACON HILL ARCHITECTURAL
COMMISSION, Defendant—
Appellant.**

No. 94–1538.

United States Court of Appeals,
First Circuit.

Heard May 8, 1996.

Decided Nov. 12, 1996.

John R. Devereaux, with whom Merita A. Hopkins and Gerald Fabiano, Boston, MA, were on brief, for defendant–appellant.

Edward N. Costikyan, Michael S. Gruen and David Nissenbaum, New York City, on brief, for The National League of Cities, The United States Conference of Mayors and The Municipal Art Society of New York, amici curiae.

James C. Heigham, with whom Choate, Hall & Stewart, Boston, MA, and Alice Neff Lucan, Washington, DC, were on brief, for plaintiffs–appellees.

Before TORRUELLA, Chief Judge, CUMMINGS * and CYR, Circuit Judges.

TORRUELLA, Chief Judge.

We visit this controversy for the second time in as many years. *See Globe Newspaper Co. v. Beacon Hill Architectural Comm'n,* 40 F.3d 18 (1st Cir.1994). We are left to decide important issues that require a balancing between First Amendment rights and governmental interests.

Defendant–Appellant Beacon Hill Architectural Commission (the "Commission") enacted a regulation, the Street Furniture Guideline, which effectively bans newspaper distribution boxes from the public streets of the Historic Beacon Hill District in Boston, Massachusetts (the "District"). The validity of this regulation was challenged in a suit filed in district court by Plaintiffs–Appellees, a group of newspaper publishers (the "Newspapers"). The district court held that the Commission lacked the authority to adopt the regulation and also that it violated rights guaranteed by the First Amendment. *See Globe Newspaper Co. v. Beacon ·Hill Architectural Comm'n,* 847 F.Supp. 178 (D.Mass. 1994).

In the ensuing appeal by the Commission, we concluded that the appropriate course of action was to certify the dispositive issue of state law to the Supreme Judicial Court of Massachusetts (the "SJC") and so proceeded. To the question

Did the Beacon Hill Architectural Commission have the authority under 1955 Massa-

chusetts Act Chapter 616 (as amended) to adopt the "Street Furniture Guideline"? the SJC answered in the affirmative. *See Globe Newspaper Co. v. Beacon Hill Architectural Comm'n,* 421 Mass. 570, 659 N.E.2d 710 (1996). In its response, the SJC held that the Commission had authority to regulate newsracks and other "street furniture" through rulemaking and to completely ban entire classes of structures such as newsracks. *Id.* at 590–91, 659 N.E.2d 710. Specifically, it said:

As to streets and sidewalks, the [C]ommission's jurisdiction is concurrent with appropriate municipal agencies. Regulation of the sidewalks is rationally related to the goal of preserving the Historic Beacon Hill District. Section 4 of the enabling [A]ct provides the [C]ommission with the authority to issue rules that govern private conduct within its particular geographic area of responsibility. We conclude that, apart from constitutional considerations, outright bans on certain classes of structures are merely a practical consequence of the [C]ommission's ability to proscribe inappropriate exterior architectural features within the [D]istrict.

*Id.* We thus focus our attention on the constitutional issue, which requires us to determine whether the Street Furniture Guideline violates rights guaranteed by the First Amendment to the Newspapers. We conclude that it does not and reverse the decision of the district court.

### BACKGROUND

The Historic Beacon Hill District was created by an act of the Massachusetts General Court in 1955. *See* 1955 Mass. Acts ch. 616 ("the Act"), as amended by 1958 Mass. Acts ch. 314 & 315, 1963 Mass. Acts ch. 622, 1965 Mass. Acts ch. 429, 1975 Mass. Acts ch. 741, and 1982 Mass. Acts ch. 624. The Act is intended to

promote the educational, cultural, economic and general welfare of the public through the preservation of the historic Beacon Hill district, and to maintain said district as a landmark in the history of architecture and as a tangible reminder of

* Of the Seventh Circuit, sitting by designation.

old Boston as it existed in the early days of the commonwealth.

1955 Mass. Acts ch. 616, § 2. The District's historical significance can hardly be doubted. *See Opinion of the Justices,* 333 Mass. 783, 786–87, 128 N.E.2d 563 (1955). Indeed, it was listed in the National Register of Historic Places and designated a National Historic Landmark on October 15, 1966, pursuant to the National Historic Preservation Act of 1966, 16 U.S.C. § 470 *et seq.*

The Commission was created to review proposed changes to the "exterior architectural feature[s]" of "structures" within the District. *See* 1955 Mass. Acts ch. 616, § 7; *see also id.* at § 3 (defining an "exterior architectural feature"); Mass. Gen. L. ch. 143, § 1 (providing definition of "structure"); *Globe Newspaper,* 40 F.3d at 20. Anyone wishing to construct, reconstruct or alter an exterior architectural feature is required to apply to the Commission for a certificate of appropriateness. The Commission, "[i]n passing upon appropriateness," shall consider, *inter alia,* "the historical and architectural value and significance, architectural style, general design, arrangement, texture, material and color of the exterior architectural feature involved and the relationship thereof to the exterior architectural features of other structures in the immediate neighborhood." 1955 Mass. Acts ch. 616, § 7. Furthermore,

the Commission must "spread upon its records the reasons for [its] determination" that a certificate of appropriateness should not issue. *Id.* An aggrieved party may appeal the Commission's decision to the Superior Court for Suffolk County, which "shall annul the determination of the [C]ommission" if it is "unwarranted by the evidence" or "insufficient in law." *Id.* at § 10.

As previously noted it was not surprising that, "given the stream of applications for certificates of appropriateness, the Commission developed uniform policies toward certain recurring types of proposed alterations." *Globe Newspaper,* 40 F.3d at 20. Specifically, in 1981, it formally adopted the policies as "guidelines." These guidelines regulate exterior architectural features such as masonry, roofs, windows, sash and shutters, doors, trim, paint, and ironwork. One of the guidelines states that "[f]reestanding signs are not permitted."

In the District, the Newspapers distribute their publications via home delivery, mail, store sales, street vendors, and "newsracks." [1] Newsracks, we explained, are newspaper distribution boxes painted in various colors and featuring the name of the newspaper and other advertising logos, which are commonly anchored to lampposts, signposts, or fixtures on the sidewalk. The plaintiffs maintain a total of thirty-nine newsracks in the district. [2] Within the District, there are eleven stores that distribute, or are available to distribute, the Newspapers' publica-

---

**1.** The record shows that the Newspapers' publications are distributed by the following methods:

| | HERALD | USA[a] | GLOBE | WSJ[b] | NYT[c] | TAB |
|---|---|---|---|---|---|---|
| Home Delivery | 21% | 5% | 7% | 97.7% | 53.3% | 0% |
| Store Sales | 46% | 78% | 65% | 1.9% | 39.6% | 0% |
| Street Vendors | 23%[d] | 0% | 16%[e] | 0% | 0% | 0% |
| By Mail | 0% | 5% | 0% | 0% | 0% | 79% |
| Newsracks | 10% | 11% | 12% | 0.4% | 7.1% | 21% |

[a] Abbreviation is to USA Today. [b] Abbreviation is to The Wall Street Journal. [c] Abbreviation is to The News York Times. [d] Street vending occurs between 6:00 a.m. and 9:00 a.m. [e] Street vending occurs between 5:30 a.m. and 9:30 a.m.

**2.** The thirty-nine newsracks maintained by the Newspapers are broken down as follows: *Boston Globe* (9); *Boston Herald* (10); *The New York Times* (8); *The Wall Street Journal* (4); *USA*

tions. Outside the District, but within one block of the District's boundaries, the Newspapers' publications are sold through stores and newsracks.[3] It is undisputed that no point within the District is more than 1,000 feet (approximately 1/5 of a mile) from a source of the Newspapers' publications.

Newsracks were first introduced to the District in the early 1980s, and by 1983, Beacon Hill residents had begun to complain of the "unsightliness, congestion and inconvenience associated with the vending machines." The Commission believed that the newsracks violated the guideline prohibiting free-standing signs. It took no enforcement action, however, because a city-wide regulation of newsracks was being discussed in the early 1980s.

In 1990, no regulation having been adopted, the Beacon Hill Civic Association petitioned the Commission for a guideline to exclude newsracks from the District. After holding a public meeting regarding the petition,[4] the Commission conducted a survey and completed, in January, 1991, a study entitled the "Publication Distribution Box Report" (the "Report"). See Exhibit H (in the record). Soon thereafter, on February 21, 1991, the Commission held a public hearing[5] on the proposal to adopt guidelines for newsracks and, ultimately, adopted the following guideline:

Publication distribution boxes (any boxes placed on the sidewalks to distribute publications, whether for charge or not) visible from a public way are not allowed within the District.

In its decision, the Commission indicated that the publication distribution guideline ("PDG") was consistent with its guideline banning freestanding signs and the Commission's decisions denying the installation of traffic signal control boxes on the sidewalks, and the regulation of the installation of a cable television system in the District.

A few months later, on April 1, 1991, the Commission notified the Newspapers of the new guideline. One month later, it requested that the Newspapers remove their newsracks by June 1, 1991. Then, after the Newspapers requested that the Commission reconsider its decision to adopt its regulation, the Commission heard testimony from the Newspapers in July, 1991. After voting to deny reconsideration, the Commission extended the removal deadline until October 1, 1991. Within a month, the Newspapers brought suit in district court seeking declaratory relief, damages, and preliminary and permanent injunctive relief from the regulation, on the grounds that it violated their First Amendment right to distribute newspapers in the District.

After a bench trial on stipulated facts, the court ruled from the bench that the regulation offended the First Amendment:

---

*Today* (3); and *TAB* (5). In addition to the Newspapers' newsracks, at least five other publishers maintain newsracks within the District. Agreed Statement of Facts at 4, p. 16.

3. The record shows that the Newspapers' publications are available in stores and newsracks near the District as follows:

|  | HERALD | USA | GLOBE | WSJ | NYT | TAB |
|---|---|---|---|---|---|---|
| Stores within one block of the District | 4 | 2 | 10 | 2 | 4 | 0 |
| Newsracks within one block of the District | 4 | 9 | 7 | 1 | 6 | 7 |

4. Although notice of this meeting was mailed to the Newspapers' main offices, notice was not received by their Circulation Departments and, of the Newspapers, only the TAB appeared and commented on the petition.

5. Again, although notice was mailed, the Newspapers' Circulation Departments did not receive the notice and, thus, did not attend.

..., "instead of being narrowly tailored with respect to the limitation on speech[, the PDG] is narrowly tailored to focus only on speech. It applies to no form of visual clutter other than public[ation] distribution boxes...." Significantly, the trial judge was "troubled whether there is statutory authority for the particular kind of legislative rule making" illustrated by the guideline. He did not decide the case on state law grounds, however, because "the questions about the Architectural Commission's authority are at least debatable on the present record ... and perhaps would require some supplementation of the record in order for the Court to resolve them...."

*Globe Newspaper,* 40 F.3d at 20 (quoting bench trial transcript).

After the bench ruling but before judgment had entered, the Commission adopted a new guideline—the present Street Furniture Guideline—that bans all "street furniture," not just newsracks, from the District:

> Street furniture, as defined below, shall not be permitted in the Historic Beacon Hill District with the exception of approved store-front merchandise stands and those structures erected or placed by authorized public agencies for public safety and/or public welfare purposes. Street furniture is defined as any structure erected or placed in the public or private ways on a temporary or permanent basis.

> Authorized public safety/public welfare street furniture includes, but is not limited to, such structures as street lights, traffic lights, mail boxes, fire hydrants, street trees, and trash receptacles. Any such authorized public safety/public welfare street furniture or approved store-front merchandise stands shall be subject to Commission review and shall be in keeping with the architectural and historic character of the District and the criteria for exterior architectural features as specified

in Chapter 616 of the Acts of 1955 as amended.

Having done so, the Commission moved for reconsideration of the judgment, arguing that the new guideline was free from the constitutional defects of the old. This time, the district judge not only held that the new guideline fared no better under the First Amendment, but also that the Commission lacked authority under Massachusetts law to adopt the new regulation.[6] *See Globe Newspaper,* 847 F.Supp. at 189.

## DISCUSSION

### I. The First Amendment and the Street Furniture Guideline

#### A. Standard of Review

■ In an appeal from an adverse ruling after a bench trial on the merits, our review is ordinarily quite circumscribed: we review *de novo* the district court's legal determinations, according a significant amount of deference to the court's factual determinations and to most of its resolutions of mixed fact/law issues, letting them stand unless they are clearly erroneous. *See AIDS Action Comm. v. MBTA,* 42 F.3d 1, 7 (1st Cir.1994). In a case such as this one, however, "where the trial court is called upon to resolve a number of mixed fact/law matters which implicate core First Amendment concerns, our review, at least on these matters, is plenary so that we may reduce the likelihood of ' "a forbidden intrusion on the field of free expression." ' " *Id.* (quoting *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 285, 84 S.Ct. 710, 729, 11 L.Ed.2d 686 (1964))). Besides furthering other interests, *see AIDS Action,* 42 F.3d at 7, "*de novo* review of the trial court's application of a First Amendment standard to the facts before it 'ensures that the federal courts remain zealous protectors of First

---

6. We decline the Commission's invitation to pass upon the validity of the original regulation as that issue is moot.

Amendment rights.' " *Id.* (quoting *Duffy v. Sarault,* 892 F.2d 139, 142–46 (1st Cir.1989)).

## B. Legal Framework

The First Amendment states that "Congress shall make no law ... abridging the freedom of speech, or of the press." U.S. Const. amend. I. It is beyond dispute that the right to distribute newspapers is protected under the First Amendment. *See City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 768, 108 S.Ct. 2138, 2150, 100 L.Ed.2d 771 (1988); *Lovell v. Griffin,* 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938); *Gold Coast Publications, Inc. v. Corrigan,* 42 F.3d 1336, 1343 (11th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 337, 133 L.Ed.2d 236 (1995). Here, the parties do not dispute that the Street Furniture Guideline effectively bans the use of newsracks as a method of distributing newspaper in the District. The issue, of course, is whether under the circumstances of the case, the Newspapers' First Amendment rights are impinged. We know that few constitutional rights, if any, are absolute, and in most constitutional litigation what courts are called upon to do is to balance competing fundamental rights. *See, e.g., Denver Area Educ. Telecommunications Consortium, Inc. v. Federal Communications Comm'n,* —— U.S. ——, ——, 116 S.Ct. 2374, 2384, 135 L.Ed.2d 888 (1996); *Board of County Comm'rs v. Umbehr,* —— U.S. ——, ——, 116 S.Ct. 2342, 2352, 135 L.Ed.2d 843 (1996). Such is the present situation.

▮ It is by now axiomatic that the degree of protection provided by the Constitution depends "on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).[7] In the instant case, the "property at issue" is the District's streets and sidewalks. The Supreme Court has repeatedly recognized public streets "as the archetype of a traditional public forum." *Frisby v. Schultz,* 487 U.S. 474, 480, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988) (noting that "[n]o particularized inquiry into the precise nature of a specific street is necessary" as all public

streets are public fora). In these traditional public fora, "places which by long tradition or by government fiat have been devoted to assembly and debate," *Perry,* 460 U.S. at 45, 103 S.Ct. at 954, government's authority to restrict speech is "sharply circumscribed." *Id.* As the Court in *Perry* explained,

> [f]or the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.

*Id.* In traditional public fora, content-based restrictions are presumptively invalid and subject to "strict" scrutiny. *See, e.g., Ackerley Communications of Mass., Inc. v. City of Cambridge,* 88 F.3d 33, 36 (1st Cir.1996); *National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 736 (1st Cir.1995). The Court in *Perry* made clear, however, that in traditional public fora

> [t]he state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

*Perry,* 460 U.S. at 45, 103 S.Ct. at 955. Such time, place, and manner regulations are subject to "intermediate" scrutiny. *See, e.g., National Amusements,* 43 F.3d at 736.

Given the "differing analytic modalities, it is unsurprising that many First Amendment battles over the constitutionality of government regulations start with a debate about what level of scrutiny is appropriate." *Id.* at 737. The instant case is no exception. The key issue is thus determining whether the Street Furniture Guideline is content-based or otherwise has a content-based impact in which publications, particularly newspapers, are singled out for negative treatment, as is claimed by the Newspapers, or is content neutral on its face and application, as is alleged by the Commission. The answer to this inquiry will allow us to establish what

---

7. Distinguishing between, say, commercial and non-commercial speech is a relevant factor. *See, e.g., Board of Trustees v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 3034–35, 106 L.Ed.2d 388 (1989). Here, we need not make precise classifi-

cations because we test, and ultimately uphold, the Street Furniture Guideline under the more stringent standards governing noncommercial speech.

level of scrutiny, strict or intermediate, is appropriate, a finding which will ultimately settle the outcome of this controversy.

## C. Content–Neutrality and Content–Based Impact

■ As this circuit has noted, "[t]he concept of what constitutes a content-based as opposed to a content-neutral regulation has proven protean in practice." *Id.* at 737. The Court's cases "teach that the 'principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.'" *Id.* (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989)). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward,* 491 U.S. at 791, 109 S.Ct. at 2754.

■ Under this test, the Street Furniture Guideline seems to be the very model of a content-neutral regulation. It does not make or otherwise demand reference to the content of the affected speech, either in its plain language or in its application. Indeed, as applied to newsracks, it operates as a complete ban without any reference to the content of a given publication whatsoever: uniquely concerned with the physical structure housing the speech, it restricts only the mode of distribution and would plainly apply even if they were empty. As such, it seems to be an example of the very kind of total ban

on newsracks which Justice Stevens was willing to assume *arguendo* might be constitutional in *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 427–28, 113 S.Ct. 1505, 1515–16, 123 L.Ed.2d 99 (1993) (holding ban on newsracks to be content-based because determining whether a newsrack fell within ban required reference to a publication's content).[8] Furthermore, like the ban on posted signs which the Court upheld in *Members of City Council of City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804–05, 104 S.Ct. 2118, 2128–29, 80 L.Ed.2d 772 (1984), the Street Furniture Guideline is directed at aesthetic concerns and is unrelated to the suppression of ideas: indeed, nothing in the record suggests that the challenged regulation arose out of an effort to suppress any particular message communicated through the newsracks, nor do the Newspapers even contend as much.[9] That the Street Furniture Guideline results in a total ban on newsracks is nothing more than an incidental effect of its stated aesthetic goal of enhancing the historic architecture of the District by reducing visual clutter: there is nothing in the record to contradict this.

The Newspapers contend, however, that this directive has a content-based impact, because it singles out publishers, and most significantly daily newspapers, serving Boston for special, negative treatment. In advancing its "targeting," "differential treatment," and "censorial effects" arguments, the Newspapers urge us to test the Street Furniture Guideline against *Minneapolis Star & Tribune v. Minnesota Comm'r of Rev.,* 460

**8.** Commenting on Justice Steven's observation in *Discovery Network,* the district court noted that "[t]he notion seems strange that a broader ban on speech is more acceptable than a narrower ban." *Globe Newspaper,* 847 F.Supp. at 195–96 (citing Justice Rehnquist's dissenting statement in *Discovery Network* that "it scarcely seems logical that the First Amendment compels such a result"). Discussing whether First Amendment doctrine creates—to use the district court's phrase—a "perverse incentive to regulate more speech," *id.* at 195, does not alter our ultimate conclusion that the present regulation is content-neutral. We, therefore, decline the invitation to engage in this unnecessary dialogue. We note in passing, however, that it is not unprecedented in constitutional jurisprudence that "broader" regu-

lations are constitutional while "narrower" ones are not. *See, e.g., 44 Liquormart, Inc. v. Rhode Island,* —— U.S. ——, —— n. 20, 116 S.Ct. 1495, 1513 n.20, 134 L.Ed.2d 711 (1996) (citing *R.A.V. v. St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) and *Cincinnati v. Discovery Network,* 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993)).

**9.** We note further there is no suggestion, let alone argument, that the Street Furniture Guideline is content-based because it is "format-based," applying only to print media, or "distribution-based," applying only to newsracks: in other words, no argument that the SFG is designed to suppress a particular message carried only through either of these two media.

U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), and *Leathers v. Medlock*, 499 U.S. 439, 111 S.Ct. 1438, 113 L.Ed.2d 494 (1991). The district court, in their view, correctly concluded that because the regulation exempts store-front merchandise and public safety/welfare structures, it singles the press for special treatment and, thus, raises "similar concerns ... of 'censorial effects'" as found by the Court in *Minneapolis Star. Globe Newspaper*, 847 F.Supp. at 199.

We disagree. As an initial matter, we are of the view that reliance upon *Minneapolis Star* by both the Newspapers and the district court is misplaced in the instant case. First, *Minneapolis Star*, one of a line of cases establishing rules for the economic regulation of the press, did not involve a time, place and manner restriction. The tax on newsprint there was held unconstitutional, because it applied only to the press and discriminated in favor of one class of publishers over another; i.e., it was *not* generally applicable. *Minneapolis Star*, 460 U.S. at 581, 103 S.Ct. at 1369–70. More importantly, unlike the Street Furniture Guideline which adversely affects only one method of distribution, the regulation there rendered all forms of circulation more burdensome. Second, unlike the case of a discriminatory tax, the Commission asserts, and the Street Furniture Guideline present regulation advances, colorable non-content-discriminatory purposes: aesthetics. Last, we believe it is not coincidental that neither of the two newsrack cases decided by the Court, *Discovery Network* and *Plain Dealer*, engaged in a *Minneapolis Star* analysis. Indeed, none of the cases that have dealt with restrictions on *newsracks* have found the restrictions to be content-based, have a content-based impact, or otherwise trigger strict scrutiny *because* they singled-out the press for regulation; in fact, *Minneapolis Star* is not even mentioned in the two newsrack cases decided by the Court. *See generally Discovery Network*, 507 U.S. 410, 113 S.Ct. 1505; *Plain Dealer*, 486 U.S. 750, 108 S.Ct. 2138.[10] That aside, even "inspect[ing] this case through the precedential

prism of *Minneapolis Star* and *Leathers*," *National Amusements*, 43 F.3d at 740, leaves us unpersuaded that there is a cognizable basis for invoking strict scrutiny.

In *National Amusements*, a panel of this court extensively discussed *Minneapolis Star* and *Leathers*. After noting the Court's statement in *Minneapolis Star* that "differential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and [that] such a goal is presumptively unconstitutional," *Minneapolis Star*, 460 U.S. at 585, 103 S.Ct. at 1372, the panel went on to discuss that in *Leathers* "the Court refined the analysis it had crafted in *Minneapolis Star* [.]" *National Amusements*, 43 F.3d at 739. *Leathers* explains "that targeting engenders strict scrutiny only when regulations (1) single out the press, (2) take aim at a small group of speakers, or (3) discriminate on the basis of the content of protected speech." *Id.* at 739–40. Essentially, then, because the Street Furniture Guideline does not discriminate on the basis of content, the Newspapers' arguments for strict scrutiny based on targeting and differential treatment hinge on one or both of the first two criteria identified in *Leathers*.

We note first that, to the extent the Newspapers' "targeting" and "differential treatment" arguments essentially rest upon the notion that strict scrutiny is always justified when the practical effect of a regulation is to regulate the First Amendment rights of a select group, this notion is misguided. *National Amusements*, 43 F.3d at 739. Simply put, this notion.

flies in the teeth of the secondary effects doctrine. Under [this] formulation, any regulation that has an effect on fewer than all First Amendment speakers or messages could be deemed to be a form of targeting and thus subjected to strict scrutiny. Yet the Supreme Court has recognized that a municipality lawfully may enact a regulation that "serves purposes

---

**10.** The only mention of *Minneapolis Star* is in Chief Justice Rehnquist's dissent in *Plain Dealer*, 486 U.S. at 797 & n. 17, 108 S.Ct. at 2165 & n. 17 (finding *Minneapolis Star*-based argument

that provision was invalid because it applied only to newsracks and not other "users" of the public streets to be "inapposite and unpersuasive" in that case).

unrelated to the content of expression ... even if it has an incidental effect on some speakers or messages but not others."

*Id.* at 740 (quoting *Ward,* 491 U.S. at 791, 109 S.Ct. at 2754). More importantly,

[i]n *Minneapolis Star,* the Court did not condemn all regulations that single out First Amendment speakers for differential treatment; rather, the Court acknowledged that certain forms of differential treatment may be *"justified by some special characteristic"* of the regulated speaker.

*National Amusements,* 43 F.3d at 740 (quoting *Minneapolis Star,* 460 U.S. at 585, 103 S.Ct. at 1372 (emphasis added)). Most relevant to the instant case, noting that "[s]econdary effects can comprise a special characteristic of a particular speaker or group of speakers," this court concluded that "the language ... quoted from *Minneapolis Star* comfortably accommodates an exception to the prohibition on differential treatment for regulations aimed at secondary effects, so long as the disparity is reasonably related to a legitimate government interest." *National Amusements,* 43 F.3d at 740.

■ The Street Furniture Guideline falls within that exception. As an initial matter, we note that there is no indication that the Commission's alleged "targeting" or "differential treatment" was done in a purposeful attempt to interfere with the Newspapers' First Amendment activities: while it clearly takes away one method of distribution, other methods are left untouched. *See ante* at 179 n. 1 and at 180 n. 3; *see also Gold Coast,* 42 F.3d at 1345 (rejecting disparate treatment argument where there was no evidence regulation was enacted because of a dislike with the message conveyed). *Cf. Leathers,* (finding tax measure avoided pitfalls because, for example, there was "no indication" that Arkansas "targeted cable television in a purposeful attempt to interfere with ... First Amendment activities").

More importantly, "street furniture" can obviously create or add to visual clutter in different ways such that solutions calling for differential treatment might be warranted. *Cf. Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 49, 106 S.Ct. 925, 929–30, 89 L.Ed.2d 29 (1986) (noting that city treats certain movie theaters differently based on the markedly different effects upon their surroundings). *See Discovery Network,* 507 U.S. at 430, 113 S.Ct. at 1517 (noting that unlike speech in *Renton* "there [were] no secondary effects attributable to" the commercial-publication newsracks that distinguished them from the non-commercial publications newsracks). While the Newspapers complain that the Street Furniture Guideline "affects no other similarly situated object" in the District, the truth of the matter is that there simply is no other such object. Not only is there no record evidence that any other entity—public or private—uses newsracks or other objects that are similarly anchored to lampposts, signposts, or fixtures on the sidewalks to distribute its product to the public, but there is also no record evidence that such an entity would not be subject to the challenged regulation. In our view, that there is no such evidence, let alone a suggestion to that effect, only underscores the "uniqueness" of the newsracks and the way in which they impact upon the District.

In reaching our conclusion, we are not swayed by the district court's findings that "[g]overnmentally-placed street furniture is exempted, and merchandise-store fronts are subjected to no more stringent review than they ever were" and/or that the "only apparent effect of the [Street Furniture Guideline] will be the removal of [the Newspapers'] publication boxes." *Globe Newspaper,* 847 F.Supp. at 199. Contrary to the Newspapers' contentions, that exempt street furniture, store-front signs, or other tangible signs of modern life may also constitute or add to "visual clutter" does not necessarily render the differential treatment unjustified: this argument ignores legitimate, if not obvious, differences among those on-street or other visible objects that are essential to the public safety and welfare—street and traffic lights, mail boxes, fire hydrants, street trees, traffic and parking signs, trash receptacles, parking meters and hitchposts—and the preferred distribution means of private entities. *See Plain Dealer,* 486 U.S. at 797–98, 108 S.Ct. at 2165 (Rehnquist, J., dissenting) (finding difference between "public services of a

quasi-governmental nature" and newsracks to be significant). Although the record is devoid of any facts regarding store-front stands,[11] the Newspapers' argument also seems to ignore practical and historical differences between merchants' on-site signs and bulky newsracks anchored along the sidewalks. It is safe to assume, at least in the absence of record evidence to the contrary, that the newsracks' overall bulky structure is reasonably predictable as compared to store-front signs, which lend themselves more readily to case-by-case review: designing the newsracks' appearance may reduce their complained-of "unsightliness" but it does not eliminate their complained-of "congestion and inconvenience."

Perhaps most importantly, we disagree with the district court's conclusion that, as in *Minneapolis Star*, "[s]imilar concerns ... in the sense of 'censorial effects' are raised by the ... Street Furniture Guideline[ ]," *Globe Newspaper*, 847 F.Supp. at 199. Not only is there no record evidence to support the conclusion that, because of the regulation, publishers might be chilled by the threat of restrictions on other methods of distribution, we fail to countenance any reasonable basis upon which to ground such a fear: none of the other methods of distribution depend upon structures which are subject to the Commission's jurisdiction. Furthermore, because it is a complete ban upon newsracks, it does not provide for, or otherwise grant, the Commission any—let alone unbridled—discretion in determining what newsracks will be allowed. *See Plain Dealer*, 486 U.S. at 769–72, 108 S.Ct. at 2150–52. As to the Newspapers' claim that the censorial effects of the Street Furniture Guideline extend beyond the District, we find nothing in the record, other that this bald assertion, to merit such a conclusion. The allegation that this regulation "sends affected publishers the message that if they criticize, annoy or otherwise offend any official with power over any forum, they may face another expensive and futile court battle" implies that the Commission has acted in a retaliatory manner by

enacting this legislation, an argument which is totally unsupported by any evidence.

Finally, we are unpersuaded by the Newspapers claim that, because the regulation deprives publishers of an already significant and still growing percentage of their readers, its impact is hardly "incidental." While, as alleged by the Newspapers, newsracks may indeed be the "indisputable workhorse" of the daily press (a contention belied by the evidence regarding the District, *ante* at 179 n. 1), nothing in the record suggests, let alone demonstrates, how the removal of the District's newsracks is so burdensome that it is not "incidental." As we see it, the Newspapers' complaint boils down to the potential reader passing through the District or the non-subscribing resident and, as we discuss later, ample alternative channels exist for the Newspapers to reach even these accidental transients passing through the District as well as those readers with more frequent ties to the District.

In sum, we find no cognizable basis for invoking strict scrutiny and, thus, apply an intermediate level of scrutiny.

### D. The Street Furniture Guideline Under Intermediate Scrutiny

■ Strict scrutiny aside, restrictions on the time, place and manner of protected expression in a public forum—and the Street Furniture Guideline's effective ban on newsracks upon the District's public and private ways certainly qualifies as such a restriction—should be upheld so long as they are "content-neutral, ... narrowly tailored to serve a significant governmental interest, and allow for reasonable alternative channels of communication." *Perry*, 460 U.S. at 45, 103 S.Ct. at 955; *see Discovery Network*, 507 U.S. at 428–431, 113 S.Ct. at 1516–18 (applying time, place, and manner test to regulation of newsracks in public forum); *Plain Dealer*, 486 U.S. at 763, 108 S.Ct. at 2147 (noting that the Court would apply time, place, and manner test to a hypothetical ordinance completely prohibiting a particular manner of expression); *see also National Amusements*,

---

11. Interestingly enough, the Newspapers did not raise the differential treatment of store-front signs when they challenged the first regulation banning newsracks, despite the fact that it would have the same effect of exempting those structures.

43 F.3d at 741 (citing other cases). *Cf. Capitol Sq. Review Bd. v. Pinette,* —— U.S. ——, ——, 115 S.Ct. 2440, 2446, 132 L.Ed.2d 650 (1995) (noting that "a ban on all unattended displays ... might be" a reasonable, content-neutral time, place and manner restriction). As we have already discussed, the Street Furniture Guideline is content-neutral. We turn, thus, to the remainder of the analysis.

### Aesthetics: A Significant Government Interest?

Pointing to the fact that preservation of the District "as a landmark" is mandated by state law, *see* Acts of 1955, ch. 616, § 12, the Commission contends that its interest in preserving the District's historic and architectural character is a substantial government interest that justifies a narrowly tailored restriction. The Newspapers roundly disagree, arguing that the Commission's invocation of its statutory purpose cannot justify a ban of newsracks in a public forum. The district court did not decide either way. Instead, it took for granted that the Commission satisfied the significant government interest prong when it "assume[d] arguendo that the Commission's [a]esthetic interest is greater than that of the average community, because [the District] has been designated a special historic district." *Globe Newspaper,* 847 F.Supp. at 194.

■ The Commission has certainly met the "significant governmental interest" prong. On more than one occasion, the "Court has recognized aesthetics …. as [a] significant government interest[ ] legitimately furthered through ordinances regulating First Amendment expression in various contexts." *Gold Coast,* 42 F.3d at 1345 (citing cases). Although there is no need to accord the Commission a greater than average interest in aesthetics, it would not be unreasonable to do so given its statutory mandate as well as the District's significance to both Massachusetts and the nation as a whole, as evidenced by its designation as a National Historic Landmark. *See* 36 C.F.R. § 65.2 (stating that such designations are reserved for "properties of exceptional value to the nation as a whole rather than to a particular State or locality").

■ We are not swayed by the Newspapers' claim that the Commission's aesthetic interests cannot constitute a significant government interest where a ban in a public forum is involved. Although it did not explicitly address, or otherwise test, the legitimacy of aesthetics through a public forum lens, the Court in *Discovery Network* acknowledged that the city's asserted interest in aesthetics was an "admittedly legitimate" interest justifying its regulation of sidewalk newsracks. *Discovery Network,* 507 U.S. at 424–25, 113 S.Ct. at 1514 (holding that newsrack regulation's distinction between commercial and non-commercial speech bore no relationship "whatsoever" to its asserted aesthetic interest). Indeed, the Newspapers' contentions to the contrary, there is abundant authority for the proposition that aesthetic interests constitute a significant government interest justifying content neutral, narrowly tailored regulations of a public forum that leave open ample alternative channels. *See, e.g., Gold Coast,* 42 F.3d at 1345 (recognizing aesthetics as "significant government interest[ ]" when upholding ordinance regulating newsracks in traditional public forum); *Chicago Observer, Inc. v. City of Chicago,* 929 F.2d 325, 328 (7th Cir. 1991) (upholding regulation of newsracks' advertising and size as justified by "[c]ities' [interest in] curtail[ing] visual clutter, for aesthetic and safety reasons"); *Plain Dealer Publishing Co. v. City of Lakewood,* 794 F.2d 1139, 1147 (6th Cir.1986) (recognizing aesthetics as a "substantial" government interest justifying total ban of newsracks in residential areas).

Our conclusion that the Commission's specified interests are "significant" does not end the inquiry. As "[i]n most cases, the outcome [of this prong] turns not on whether the specified interests are significant, but rather on whether the regulation is narrowly tailored to serve those interests." *Gold Coast,* 42 F.3d at 1345.

### Is the Street Furniture Guideline Narrowly Tailored?

■ As the district court correctly set forth, the Court in *Ward* "explained that the

narrow tailoring requirement does not mandate a least restrictive means analysis: '[r]ather, the requirement of narrow tailoring is satisfied so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *National Amusements,* 43 F.3d at 744 (quoting *Ward,* 491 U.S. at 799, 109 S.Ct. at 2758). The regulation will be valid if it does not burden "substantially more" speech than is necessary to further the government interest. *Ward,* 491 U.S. at 799, 109 S.Ct. at 2758; *see Gold Coast,* 42 F.3d at 1345. Where aesthetic interests are at play, the challenged regulation must be judged by overall context: the government must show that the regulation of the feature at issue "would have more than a negligible impact on aesthetics," which generally requires that the government be making a *bona fide* or "comprehensive coordinated effort" to address aesthetic concerns in the affected community. *See Metromedia, Inc. v. San Diego,* 453 U.S. 490, 531, 101 S.Ct. 2882, 2905, 69 L.Ed.2d 800 (1981).

In a nutshell, the district court held that the challenged regulation did not pass muster under the First Amendment because the Commission "has shown no reason why its interest in preserving the architectural and historic character of the [D]istrict cannot be met by, for example, subjecting newsracks and other street furniture to the same review process as store-front merchandise racks." *Globe Newspaper,* 847 F.Supp. at 194. In reaching this conclusion, the district court took its cue from the Court's statement in *Discovery Network:* while a regulation need not satisfy the "least-restrictive-means" test,[12] "if there are numerous and obvious less-burdensome alternatives to the restric-

tion on ... speech, that is certainly a relevant consideration." *Discovery Network,* 507 U.S. at 417 n. 13, 113 S.Ct. at 1510 n. 13.[13] With this in mind, the district court observed that

> [t]he SFG assumes that "street lights, traffic lights, mail boxes, fire hydrants, street trees, and trash receptacles," can be designed in such a fashion that they will be "in keeping with the architectural and historic character of the District." The same is true for store-front merchandise stands.... There is no showing that newsracks are any more inherently out of keeping with the architectural character of the [District] than other modern innovations that have been approved by the Commission on the basis of their external design features.

*Globe Newspaper,* 847 F.Supp. at 194–95. In the district court's view, "the preference given to 'public' street furniture and store-front stands ... [i]s evidence that the [Street Furniture Guideline] ... is ... not narrowly tailored," *id.,* and "burdens substantially more speech than is necessary to serve the Commission's interest in preserving the character of the District," *id.* The Newspapers contend that this is correct.

▮▮▮▮ We disagree, and conclude that the regulation is narrowly tailored. First, and without a doubt, it promotes the Commission's significant or substantial[14] government interest in preserving the District's aesthetics: as the SJC observed, "the [C]ommission has determined that [newsracks] are inappropriate, in part because they did not exist at the time with which the [C]ommission's preservation efforts are concerned." *Globe Newspaper,* 421 Mass. at 590, 659

---

**12.** *See Gold Coast,* 42 F.3d at 1346 n. 12 (noting that reliance on newsrack cases using "least restrictive means" is misplaced due to subsequent Supreme Court cases rejecting that standard).

**13.** Although the Court in *Discovery Network* made this observation while applying the test applied to commercial speech, *see, e.g., Board of Trustees,* 492 U.S. at 480, 109 S.Ct. at 3034–35, "[b]ecause commercial speech receives less First Amendment protection than does non-commercial speech ... and [because] intermediate scrutiny also does not impose a 'least-restrictive-means' analysis, ..., [this observation] clearly

applies to determinations of narrow tailoring under intermediate scrutiny." *Chesapeake & Potomac Tel. Co. of Va. v. United States,* 42 F.3d 181, 199 n. 29 (4th Cir.1994).

**14.** "The term 'significant interest' is equivalent to the terms 'important interest' and 'substantial interest,' and these phrases are often used interchangeably." Rodney A. Smolla & Melvin Nimmer, *A Treatise on The First Amendment,* § 3.02[3][A] at 3–36 & n.95 (1994) (noting that *Ward,* 491 U.S. at 796, 109 S.Ct. at 2756–57, uses "significant" and "substantial" in adjacent sentences).

N.E.2d 710. Second, as the Report's review of the five available alternatives [15] indicate, the Commission's aesthetic interest in preserving the District's historic and architectural character would not be achieved as effectively, absent the regulation: banning the newsracks would effectively, as the Commission's Report observed, most completely "reverse" their inappropriateness and "be most consistent with the purposes of the [D]istrict." [16] Exhibit H at 7. Finally, it does so without burdening "substantially more" speech than is necessary: it does not burden, or otherwise adversely affect, any other means of distribution, including the use of street vendors in the public forum. *See ante* at 179 n. 1. Significantly, we note that the district court acknowledged, albeit implicitly, that the challenged regulation meets this test: nowhere in its opinion did the district court conclude that the Street Furniture Guideline would fail to advance the Commission's interest or that its interest would be achieved as effectively absent the regulation.

In reaching our conclusion, we are mindful of the district court's "findings" that the

Commission's interest could be met by, say, "subjecting newsracks and other street furniture to the same review process as storefront merchandise racks," and that it treats some "street furniture" with "preference." Unlike the district court, however, we do not conclude that such findings compel a determination—at least in this case—that the Street Furniture Guideline burdens "substantially more" speech than is necessary to accomplish its purpose and, thus, is not narrowly tailored. While the district court correctly considered the fact that less-burdensome alternatives exist, it gives too much weight to that fact alone. In so doing, it essentially discounts from the equation *Ward*'s inquiry into whether the Street Furniture Guideline "promotes [the Commission's interests such] that [they] would be *achieved less effectively absent the [Street Furniture Guideline]." Ward*, 491 U.S. at 799, 109 S.Ct. at 2758 (emphasis added).[17]

■ We explain: As an initial matter, the Court in *Discovery Network* explained that

15. The dissent levels several attacks at the Commission's consideration of the five available alternatives. We believe that none of these contentions withstand scrutiny. First, if, by requiring that the Commission "actively consider[ ] alternative newsrack design proposals," the dissent means to suggest that the Commission was required to implement or experiment with other alternatives before finally choosing the total ban, we simply disagree that *Discovery Network* requires this.

Second, that the Commission failed to send notice of the public hearing to the plaintiffs' circulation departments is irrelevant because the Commission granted a reconsideration hearing upon the Newspapers' request after the original ban was promulgated.

Finally, we disagree with the dissent's last point that the Commission's failure to regulate newsracks on an individualized basis, as it does some other appurtenances, displays a decision lacking careful calculation. That the Commission has chosen a total ban on only newsracks, and applied different measures more relevant to the other appurtenances, shows that the Commission made its determination based on the interests and concerns uniquely related to newsracks.

16. The dissent contends that the Commission's actions—holding two public meetings, conducting a survey, publishing a study, and taking additional testimony at the Newspapers' request—

do not evidence a "carefully calculated" determination that the ban on newsracks is the most suitable solution "proportionate to the resulting burdens on any protected First Amendment activity." *See post* at 197–98 (citing *Discovery Network*, 507 U.S. at 416 n. 12, 113 S.Ct. at 1510 n. 12). The dissent suggests that the Commission's decision was not "carefully calculated" because it failed to employ or consider incremental, experimental alternatives to a total ban on newsracks. *Id.* at 198. We believe, however, that the Commission's study, in addition to its other actions, demonstrate that it in fact carefully calculated its determination of the alternative that most comprehensively met each of its interests and, at the same time, burdened no more speech than necessary to further this interest. *See Ward*, 491 U.S. at 799, 109 S.Ct. at 2758. Additionally, we do not read *National Amusements* to require the Commission to engage in experimental employment of alternative measures or otherwise engage in further calculation of the "suitability" of alternatives beyond that which its study demonstrates it has done.

17. The district court, despite its statement to the contrary, seems to have applied the "least restrictive means" test when it calibrated the "narrow-tailoring" scales. In closing, it stated: "A regulator's declaration of benign purpose cannot justify a needless burden on rights of expression caused by the regulator's blunt instrument when finer instruments are available." *Globe Newspaper*, 847 F.Supp. at 200.

the existence of "numerous and obvious less-burdensome alternatives ... is certainly *a* relevant consideration." *Discovery Network*, 507 U.S. at 418 n. 13, 113 S.Ct. at 1510 n. 13 (emphasis added). Standing alone, this plainly means that, while "certainly a relevant consideration," *id.*, it is not necessarily a controlling one: *i.e.*, that "numerous and obvious less-burdensome alternatives" exist does not automatically compel the conclusion that a regulation burdens "substantially more" speech than is necessary. When read in light of *Ward*, it becomes clear that less-burdensome alternatives must be considered in connection with the inquiry into whether, *absent the challenged regulation*, the government's interests are *achieved less effectively*. Giving too much weight to the existence of alternatives, without calibrating the scales to account for differences between them and the challenged regulation in terms of overall effectiveness and impact on aesthetics, may result—as here—in error: that the record, here, reveals that the Commission's interests are *achieved less effectively absent the Street Furniture Guideline* was apparently lost in the shuffle.

▇ In other words, the Court's qualifier in *Discovery Network* must, in turn, be qualified—or, rather, "re-qualified"—by its language in *Ward*, lest *Ward*'s explicit rejection of the "least restrictive means" test be reduced to a meaningless phrase. As the Court made clear in *Ward*:

> So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. "The validity of [time, place, and manner] regulations does not turn on a judge's agreement with the responsible decision-maker concerning the most appropriate method for promoting significant government interests" or the degree to which those interests should be promoted.

*Ward*, 491 U.S. at 800, 109 S.Ct. at 2758 (quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 2907, 86 L.Ed.2d 536 (1985)). As the Sixth Circuit observed, the Court "has repeatedly deferred to the aesthetic judgments of municipalities and other government bodies when evaluating restrictions on protected expression." *Gold Coast*, 42 F.3d at 1346 (citing, among others, *Vincent*, 466 U.S. at 807, 104 S.Ct. at 2130, and *Metromedia*, 453 U.S. at 512, 101 S.Ct. at 2895). Of course, as *Discovery Network*'s language implicitly reaffirms, courts are not merely to defer to the government's subjective judgment; instead, aesthetic considerations must be judged by overall context and the government must make its requisite showing. *Metromedia*, 453 U.S. at 530, 101 S.Ct. at 2904.

Under this rubric, while we do not dispute that the Commission *could* have adopted a less drastic solution, the fact that it chose not to does not mean that it did not "carefully calculate[ ] the costs and benefits associated with the burden on speech imposed by [the Street Furniture Guideline]." *Discovery Network*, 507 U.S. at 417, 113 S.Ct. at 1510. In *Discovery Network* the Court found that the city there did not make a careful calculation based on the fact that it did not address its "recently developed concern about newsracks by regulating their size, shape, appearance, or number." *Id.* In this regard, it also noted that the "benefit to be derived from the removal of 62 newsracks while about 1,500–2,000 remain in place was considered 'minute' by the [d]istrict [c]ourt and 'paltry' by the [c]ourt of [a]ppeals." *Id.*

▇ Unlike the city in *Discovery Network*, however, the Commission's actions since newsracks became a subject of concern in the early 1980s—including survey, report and public hearings—demonstrate that it carefully calculated the costs and benefits. The path it chose to follow—eliminating the newsracks altogether—is the most effective solution aimed at reducing visual clutter and preserving the District's historic character. Designing the newsracks to better "blend in" and conform with the District's architectural and historic character by having, say, an "old-fashioned" or colonial "look," would promote the Commission's interest by reducing their "unsightliness." It would not achieve, however, as effective a reduction in "the visual clutter created by their presence on the

sidewalks [which] clearly detracts from the historic and architectural character of the [D]istrict,"[18] or, for that matter, the long-standing concerns regarding "congestion and inconvenience."

Our conclusion is not swayed by the Newspapers' protestations that the Street Furniture Guideline, as applied to Charles Street (the most commercial in the District), is a "lost cause" and that the regulation does not remove all evidence of modern life. It is also not influenced by the district court's finding that there has been "no showing that newsracks are any more inherently out of keeping with the architectural character of the [D]istrict than other modern innovations."[19] 847 F.Supp. at 194–95. These contentions miss the point. As the SJC correctly observed, "the [C]ommission's charge is to preserve what it can of the ... District as a tangible reminder of old Boston. That particular nonconforming uses predated that charge ..., or that certain non-conforming uses have since been allowed to continue, has no effect on ongoing attempts the [C]ommission makes in preserving the [D]istrict." *Id.* More importantly, as the Court in *Vincent* made clear when it rejected a similar argument, "[e]ven if some visual blight remains, a partial, content-neutral ban may nevertheless enhance the City's appearance." *Vincent*, 466 U.S. at 811, 104 S.Ct. at 2132 (rejecting argument that "the validity of the [a]esthetic interest in the elimination of signs on public property is not compromised by failing to extend the ban to private property"). Indeed, in contrast to both *Vincent* and *Metromedia* where the regulations were arguably "partial-solutions," the Street Furniture Guideline completely tackles the newsracks' visual clutter and inappropriateness by eliminating them altogether. *See Vincent*, 466

U.S. at 811, 104 S.Ct. at 2132 (banning signs on public property but not private property); *Metromedia*, 453 U.S. at 512, 101 S.Ct. at 2895 (banning off-site advertising but not on-site advertising).

What is more, the Newspapers' argument, which is implicitly based on the notion that newsracks within the District may only be regulated as part of a comprehensive beautification or, better yet, "visual clutter reduction" plan, was rejected foursquare by the Court in *Vincent*, 466 U.S. at 807 n. 5, 104 S.Ct. at 2123 n. 5, and *Metromedia*, 453 U.S. at 511–12, 101 S.Ct. at 2894–95; *see Chicago Observer*, 929 F.2d at 328 (making this observation). In any event, we dismiss as disingenuous the Newspapers' suggestion that the challenged regulation is not part of a "comprehensive" plan because it does not ban all "street furniture" or all evidence of modern life: not only is the Street Furniture Guideline consistent with its long-standing prohibition against freestanding signs, the Commission's guidelines, review process, decisions regarding cable television control boxes and traffic control boxes, not to mention its thorough approach regarding newsracks, all speak for themselves. *See Gold Coast*, 42 F.3d at 1346 (finding city took several steps to enhance its aesthetic interest by convening a task force, conducting research, and revising ordinance).

Last, but not least, contrary to the Newspapers' suggestion, that the Street Furniture Guideline operates as a complete ban does not, by itself, mean that it is not "narrowly tailored." While the Court has clearly "voiced particular concern with laws that foreclose an entire medium of expression," *City of Ladue v. Gilleo*, 512 U.S. 43, ——, 114 S.Ct. 2038, 2045, 129 L.Ed.2d 36 (1994) (invalidating ordinance banning all residen-

---

**18.** *See* The Report, Exhibit H at 2.

**19.** In any event, we disagree with this observation. As the Agreed Statement of Facts indicates, the District's street pattern includes many narrow pedestrian streets and lanes. The newsracks, which began to appear on the scene in the 1980s, are obviously out of character with the District's street pattern and it is utterly irrelevant that some streets may not be as narrow as they once were. Furthermore, as the Agreed Statement of Facts evidences, much of the exempt "street furniture" that would constitute "other

modern innovations" was installed in the District long before newsracks came on the scene and, indeed, in some cases apparently prior to the creation of the District in 1995. That said, we reiterate that this observation ignores the obvious differences between the public safety/welfare structures providing indispensable services and private structures erected on public property whose function, although no doubt important, can be served in ways that do not require "appropriation" of public property.

tial signs), bans on the use of privately owned structures or displays on public property have been upheld. *See Vincent,* 466 U.S. at 804–05, 104 S.Ct. at 2128–29 (upholding ban on signs posted on public utility poles).

█ In *Vincent,* the Supreme Court addressed a challenge to an ordinance banning all posted signs in the city brought by supporters of a political candidate. *Vincent,* 466 U.S. at 792–93, 104 S.Ct. at 2122. The supporters argued that the ban unconstitutionally abridged their freedom of speech. *Id.* at 802–03, 104 S.Ct. at 2127. The Court recognized that the complete ban, like the ban here, "did no more than eliminate the exact source of the evil it sought to remedy." *Id.* at 808, 104 S.Ct. at 2130. The *Vincent* Court compared the sign ban to the ordinance banning handbilling to address littering problems that the Court struck down in *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). In making its determination that the total ban in *Vincent* was narrowly tailored to serve the government's interest in aesthetics, the Court distinguished between the state's unconstitutional exercise of police power to regulate litter by prohibiting the distribution of handbills and the constitutional exercise of that power to completely eliminate the substantive evil addressed. Unlike the situation of littering, the evil in *Vincent,* as here, "is not merely a possible byproduct of the [protected expressive] activity, but is created by the medium of expression itself." *Id.* at 810, 104 S.Ct. at 2131. The Court held that, because the *Vincent* regulation directly resolved the evil the city sought to address, the medium of expression, the regulation was narrowly tailored to the city's interest in aesthetics and limiting visual blight. *Id.* Similarly, the Commission's ban on the use of private newsracks, which are both the exact evil presented and the medium of expression, is narrowly tailored to the government interest in eliminating the visual blight and congestion on public property caused by that evil.

Moreover, unlike cases where the medium of expression involves the exercise of speech by an individual or where the medium is a uniquely valuable mode of expression, *see, e.g., Ladue,* 512 U.S. at ———, 114 S.Ct. at 2045 (citing cases), the medium of expression here is the use of a privately owned structure placed on public property for which, as we discuss below, there are ample alternative channels available for the distribution of the Newspapers' publications.

In sum, we conclude—contrary to the district court—that the Street Furniture Guideline is narrowly tailored.

### The Final Hurdle: Ample Alternative Channels?

The district court did not reach this final prong,[20] but we must before the full First Amendment analysis is completed.

Below, and on appeal, the Commission claims that ample alternative channels exist. The challenged regulation, it points out, leaves unaffected the Newspapers' primary means of distribution within the District: home delivery, sales by stores, street vendors, and mail. *See ante* at 179 n. 1. Even without newsracks, the Commission highlights, the Newspapers' publications are available within the District 24–hours a day, seven days a week, through private stores. Further still, it is undisputed that no point within the District is more than 1,000 feet (approximately 1/5 of a mile) from a source of publications and that adjacent to the District numerous additional sources exist, including newsracks:[21] this, it emphasizes, is well within the 1/4 mile distance that the Sixth Circuit found sufficient in *Plain Dealer* when it upheld a ban on newsracks in a residential neighborhood. *See Plain Dealer,* 794 F.2d at 1147.

Relying on *Chicago Newspaper Publishers v. City of Wheaton,* 697 F.Supp. 1464, 1470 (N.D.Ill.1988) ("[t]he availability of private sellers is irrelevant"); and *Providence Jour-*

---

**20.** Although the district court found that the PDG did not leave open ample alternative channels for free publications, such as the TAB, it did not make this finding regarding the Street Furniture Guideline.

**21.** *See ante* at 180 n. 3.

*nal Co. v. City of Newport*, 665 F.Supp. 107, 118–19 (D.R.I.1987) (same), the Newspapers counter with the argument that the availability of private sources is irrelevant to the inquiry. Accordingly, they claim that the only relevant available means of distribution is the use of street vendors in the public forum. While street vendors are unaffected by the Street Furniture Guideline, the Newspapers nonetheless contend that, because the cost of 24–hour street vending is substantially more burdensome than placing stationary newsracks, the regulation fails to leave available any practical or economical alternative to newsracks.

▮ We are unpersuaded by the Newspapers' arguments regarding street vendors. Without having to address the merits of whether the availability of private sources is relevant to the inquiry,[22] or resolve whether it is appropriate to rely on the proximity of newsracks on the District's boundaries,[23] we conclude that there are ample alternative channels available for the distribution of the Newspapers' publications. *See ante* at 179 n. 1. Throughout our analysis, we are mindful that "the lens of inquiry must focus not on whether a degree of curtailment exists, but on whether the remaining communicative avenues are adequate." *National Amusements*, 43 F.3d at 745.

Here, it is undisputed that the Street Furniture Guideline does not affect the Newspapers' freedom to exercise their right to distribute publications through street vendors in the very public forum—the District's sidewalks—from which the newsracks are banned. *See Vincent*, 466 U.S. at 812, 104 S.Ct. at 2132–33 (finding ample alternative channels available where ordinance "did not affect any individual's right to exercise the right to speak and distribute literature in the same place where the posting of signs . . . is prohibited"). Thus, without relying on the other current means of distribution within the District, the numerous private sources both within and without the District, or the proximity of newsracks outside the District, we conclude that the Street Furniture Guideline satisfies this last prong. We note further that street vendors—or "newsboys" per the Agreed Statement of Facts—began hawking newspapers on the streets of Boston in approximately 1844; thus, street vending is an alternative within the public forum that is consistent with the District's purpose.

▮ In reaching this conclusion we reject as essentially irrelevant the contention that the cost of street vendors, let alone 24–hour street vending, is substantially more costly than placing a stationary newsrack. The First Amendment does not guarantee a right to the most cost-effective means of distribution or the rent-free use of public property. *Cf. Capitol Sq. Review Bd. v. Pinette*, —— U.S. ——, ——, 115 S.Ct. 2440, 2446, 132 L.Ed.2d 650 (1995) ("It is undeniable, of course, that speech which is constitutionally protected against state suppression is not thereby accorded a guaranteed forum on all property owned by the State."); *Regan v. Taxation with Representation*, 461 U.S. 540, 546, 103 S.Ct. 1997, 2001, 76 L.Ed.2d 129 (1983) (rejecting the notion that "First Amendment rights are not somehow fully realized unless they are subsidized by the State"). Moreover, the Newspapers' claim that street vendors are not a practical alternative is belied by the record, particularly with respect to the daily papers serving the Boston area: sales by street vendors for both the *Boston Herald* and the *Boston Globe* exceed those by newsracks. *See ante* at 179 n. 1. What is more, the record shows that newsracks come in either last or second-to-

---

**22.** *Compare Chicago Newspaper*, 697 F.Supp. at 1470; *Providence Journal*, 665 F.Supp. at 118–19; *with Multimedia Publishing Co. of S.C., Inc. v. Greenville–Spartanburg Airport Dist.*, 991 F.2d 154, 160 (4th Cir.1993) (invalidating ban on newsracks in airport terminal, a non-public forum, due to the lack of market forces that provide private sources in public fora); *Plain Dealer*, 794 F.2d at 1147 (existence of alternative channels on private property considered).

**23.** *See Chicago Newspaper*, 697 F.Supp. at 1471 (noting that city "cannot rely on other municipalities to rescue them from the consequences of an improperly drawn ordinance") (citing *Schneider v. State*, 308 U.S. 147, 163, 60 S.Ct. 146, 151–52, 84 L.Ed. 155 (1939) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.")).

last place in terms of percentage of distribution. *Id.*

While we do not dispute the Newspapers' claims that newsracks provide a relatively inexpensive means of distribution, which in some cases meet distribution needs where others are either prohibitively expensive or altogether unavailable, nothing in the record indicates how these concerns are implicated in the instant case. Indeed, there is nothing in the record to suggest, let alone show, that the newsracks within the District fulfill a unique distribution need which is not currently satisfied by other means of distribution and which could not be satisfied by a street vendor. As we see it, their claim boils down to the accidental reader who passes through the District and the District resident who prefers single-copy sales. Although the regulation may frustrate the preferences of these readers, "thwarting ... an idiosyncratic [or not so idiosyncratic] preference cannot be equated with a denial of adequate avenues of communication." *National Amusements,* 43 F.3d at 745. While the Street Furniture Guideline diminishes the total quantity of the Newspapers' publications within the District, that is a necessary side effect of almost any restriction on speech: "As long as restrictions are content-neutral, some diminution in the overall quantity of speech will be tolerated." *Id.* (citing *Vincent,* 466 U.S. at 803, 812, 104 S.Ct. at 2127–28, 2132–33).[24]

In addition, our conclusion is not swayed by the assertion that street vending may not be a viable alternative for all publications, particularly those that are free, such as the TAB.[25] While we are aware that the Court, with good reason, "has shown special solicitude for forms of expression that are much less expensive than feasible alternatives and

hence may be important to a large segment of the citizenry, ... this solicitude has practical boundaries." *Vincent,* 466 U.S. at 812 n. 30, 104 S.Ct. at 2133 n. 30 (citations omitted). Given that the regulation neither affects the TAB's primary means of distribution, the mail, which accounts for 79% of its distribution, nor prohibits the use of street vendors, such "practical boundaries" exist here. In any event, absent any record evidence regarding the feasibility or infeasibility of street vending for free publications, such as the TAB, we are particularly reluctant to treat free publications differently than those "for charge," or to otherwise alter our conclusion.

In short, "[a]s the Court phrased it: 'That the city's limitations on volume may reduce to some degree the potential audience for respondent's speech is of no consequence, for there has been no showing that the remaining avenues of communication are inadequate.'" *National Amusements,* 43 F.3d at 745 (quoting *Ward,* 491 U.S. at 802, 109 S.Ct. at 2760). Here, because the SFG leaves intact an alternative means of distribution within the public forum, and in the absence of any record evidence "call[ing] into legitimate question the adequacy of the alternate routes for [distribution]," *National Amusements,* 43 F.3d at 745, we conclude that the Street Furniture Guideline's effective ban on newsracks in no way runs afoul of the Newspapers' First Amendment right to distribute their publications. Accordingly, with this last prong satisfied, we find that the challenged guideline passes muster under the First Amendment: it is a reasonable, content-neutral time, place and manner restriction on the Newspapers' right to distribute their publications in the District.

---

24. Were we to widen the scope of relevant alternative sources beyond street vendors, these potential readers could obtain their preferred publications from newsracks on their way in and/or out of the District or from one of the numerous stores carrying them.

25. When the district court made its bench ruling that the original regulation did not leave open ample alternative channels it noted that "there is a special problem" with respect to the impact upon free publications, such as the TAB. Although the Newspapers had not raised this issue and despite the absence of record evidence, the

district court's conclusion was based on the assumption that stores would not have the same economic incentive to serve as conduits for the distribution of free publications. Despite the subsequent admission of evidence showing that "no-charge" publications were carried in the District's stores, the court did not abandon its "finding" on this point when it reconsidered its ruling on the new regulation. There is no mention of this or any other similar finding in the district court's opinion regarding the Street Furniture Guideline.

### Some Additional Thoughts

We have considered the Newspapers' other arguments and find them to be without merit. We pause briefly, however, to respond to a few of them.

First: Contrary to their contention, and as the foregoing discussion makes clear, the Street Furniture Guideline in no way denies the Newspapers the ability to make their publications available to those "willing to receive" them. Indeed, there is simply nothing in the record to support this bald assertion.

Second: We also reject as utterly without merit the notion that, by upholding a ruling that bans a common and useful means of newspaper distribution, our decision today opens the door to the "piecemeal destruction of the public forum." We are simply at a loss to see how the public forum is "destroyed" by such a valid content neutral, time, place and manner restriction on the distribution of protected speech—particularly where, as here, the Newspapers are free to distribute their publications from the very same spot within the public forum where their newsracks have been located.

■ Last, but not least: We also dismiss as irrelevant their claim that the SJC's decision signals a danger for newsracks in all historic districts: even if this were true, as long as the regulations are valid content neutral, time, place and manner restrictions, what of it? As noted above, while the First Amendment guarantees the right to circulate publications, it does not guarantee the right to do so through private structures erected on public property. No one disputes that regulations governing newsracks, because they facilitate the distribution of protected speech, are subject to First Amendment scrutiny. What the Newspapers fail to appreciate is that newsracks are nothing more than structures occupying, if not monopolizing, public space on the sidewalks, which—with or without publications within—simply are not immunized from regulations passing muster under the First Amendment.

In sum, our opinion today stands unaffected by the clatter of these alarmist claims. Without more ado, we reverse the district court's decision.

### II. Attorney's Fees

■ The Commission also appeals from the district court's award of attorneys fees to the Newspapers as the "prevailing party" under 42 U.S.C. § 1988. In light of our opinion today reversing the judgment below on the merits, we need not address the Commission's claims of error. As a judgment in favor of the Newspapers is reversed on the merits, that party is no longer a "prevailing party" under 42 U.S.C. § 1988 and, thus, no longer entitled to attorney's fees under that statute. *See, e.g., Lewis v. Continental Bank Corp.,* 494 U.S. 472, 483, 110 S.Ct. 1249, 1256, 108 L.Ed.2d 400 (1990); *Clark v. Township of Falls,* 890 F.2d 625, 626–28 (3d Cir.1989).

### CONCLUSION

For the foregoing reasons, the district court's decision is **reversed**, the award of attorneys' fees is **vacated**, and the case is remanded to the district court for entry of judgment in favor of the Commission, and for such further necessary and appropriate proceedings and orders as are consistent with this decision.

*Costs are granted to Appellant.*

CYR, Circuit Judge (dissenting).

As I agree with the district court, *see Globe Newspaper,* 847 F.Supp. at 193–95, that the Commission has yet to establish, *inter alia,* that its Street Furniture Guideline is "narrowly tailored," *Perry,* 460 U.S. at 45, 103 S.Ct. at 955; *see North Ave. Novelties, Inc. v. City of Chicago,* 88 F.3d 441, 444 (7th Cir.1996) (noting that government must show that its "time, manner, and place" restriction on protected speech is "narrowly tailored"), I respectfully dissent.

This case turns on whether the Commission established that its outright ban on all newsracks within the District represents a reasonable means to its concededly legitimate regulatory end, in the sense that the ban "is in proportion to the interest served"; that is to say, "not necessarily the least restrictive means," but one which is "narrowly tailored to achieve the desired objective." *Cincinnati,* 507 U.S. at 416 n. 12, 113 S.Ct. at

1510 n. 12 (quoting *Board of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480, 109 S.Ct. 3028, 3035, 106 L.Ed.2d 388 (1989)) (internal quotation marks and citations omitted). As the Supreme Court has made clear, both in *Fox* and *Cincinnati,* the government must demonstrate that it "carefully calculated" the resulting burdens on expressive activity protected by the First Amendment, *Cincinnati,* 507 U.S. at 416 n. 12, 113 S.Ct. at 1510 n. 12, which involves something more than simply identifying a legitimate regulatory purpose.

The Commission is specifically charged with preserving the District as a unique "old Boston" community and the importance of preserving the architectural and historical esthetics within the District, for the benefit of the community, the Commonwealth, and the Nation, is not in question. *See Vincent,* 466 U.S. at 806–07, 104 S.Ct. at 2129–30. Nonetheless, the sweeping presumption indulged by the Commission—that the nonconforming nature of all newsracks represents an esthetic blight only an outright ban can remedy—is not entitled to deference in the First Amendment context. The Commission is required first to demonstrate that it carefully considered obvious alternative regulatory means before imposing its outright ban against all newsracks within the District. *See Cincinnati,* 507 U.S. at 417 n. 13, 113 S.Ct. at 1510 n. 13 (rejecting "mere rational basis review"). The record does not demonstrate that the Commission has met its burden.

By the same token, the unquestionable efficiency of a *total ban* on all newsracks does not satisfy the "narrow tailoring" requirement. Otherwise, there would be virtually no role left to be served by the requirement that governmental entities "carefully calculate" the burdens their regulatory actions impose on protected expressive activity, *see id.* at 416 n. 12, 113 S.Ct. at 1510 n. 12, since an outright ban will almost invariably prove most efficient in rooting out unbecoming appurtenances. Moreover, unlike public-safety regulations, for example, esthetics-based regulations often stem from subjective assessments not readily amenable either to objective measurement or empirical refuta-

tion, thereby warranting careful judicial scrutiny. *See Metromedia,* 453 U.S. at 510, 101 S.Ct. at 2893–94; *see also Ward,* 491 U.S. at 793, 109 S.Ct. at 2754–55.

The historical basis for the Commission ban against all newsracks within the District is incontestable: newsracks "did not exist at the time with which the [C]ommission's efforts are concerned." While the District is "a tangible reminder of old Boston," however, it nonetheless remains a contemporary residential and commercial community. Charles Street, for example, accommodates numerous modern commercial conveniences (*e.g.,* gas stations) presumably alien, if not offensive, to the esthetic sensibilities of even the most indurate "old Bostonian." Thus, notwithstanding the Commission mandate to preserve the District's colonial and post-colonial characteristics, residents rely upon (or at least tolerate) many uncharacteristic obtrusions, at least one of which (cable television boxes) presumably was introduced after the Commission came into existence in 1955. Various other anachronous utilities abound as well — including paved roads and sidewalks, automobiles, traffic signals, streetlights, trash receptacles, mail boxes, and fire hydrants — not only along Charles Street but throughout the District. Even though many of these nonconforming modernities are *regulated* by the Commission — often robustly — *rather than banned outright,* the Commission concedes that newsracks are the only "street furniture" it subjects to an outright ban.

As the district court correctly noted, there can be no question that an outright ban on all nonconforming modernities (*e.g.,* as at Plymouth Plantation or Williamsburg) offers the most efficient approach to restoring historical and architectural integrity. Where the First Amendment is implicated, however, efficient governmental regulation must be "narrowly tailored." Yet the Commission neither demonstrates that "obvious less-burdensome alternatives" are unavailable, *Cincinnati,* 507 U.S. at 417 n. 13, 113 S.Ct. at 1510 n. 13, nor explains why the *ad hoc* permitting process it uses to regulate anachronous utilities such as cable television boxes should not be enlisted for newsrack regulation. *Cf. Vincent,* 466

U.S. at 808, 104 S.Ct. at 2130–31 (noting *Metromedia* plurality's view that "[i]t is *not speculative* to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm' ") (emphasis added).

Furthermore, the Commission has not explained its rationale for concluding — let alone demonstrated, see *Cincinnati*, 507 U.S. at 417, 113 S.Ct. at 1510 — that a permissible basis exists for *assuming* that newsracks, without regard to size, signage, design, color, location or number, cannot comport with its esthetic standards. *See Chicago Newspaper Publishers Ass'n v. City of Wheaton*, 697 F.Supp. 1464, 1470 (N.D.Ill.1988) (noting that city "has not explained ... how a newsrack on a residential street destroys the 'character' of the neighborhood any more than a mailbox, utility pole, fire hydrant, or traffic sign").[26] Nor has the Commission shown that any perceived "visual clutter" could not be addressed by restricting, severely *if necessary*, the location (*e.g.*, within the Charles Street "commercial" zone) and the number of newsracks within the District. Plainly, these obvious alternatives, if efficacious, would be much less burdensome on the important First Amendment expressive activity the Commission proposes to ban outright.

As the court appropriately acknowledges, of course, considerable deference is due the Commission. *See supra* p. 190.

Nevertheless, deference to an outright ban on protected expressive activity cannot be predicated on anything less than a reasoned showing that the Commission "carefully calculated" alternative means with a view to their suitability to address legitimate regulatory interests *proportionate* to the resulting burdens on any protected First Amendment activity. *Cincinnati*, 507 U.S. at 416 n. 12, 113 S.Ct. at 1510 n. 12; *see also Vincent*, 466 U.S. at 803 n. 22, 104 S.Ct. at 2127 n. 22 (warning that courts "may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgment of expressive activity"). The Commission adopted its outright District-wide ban on all newsracks without either attempting less draconian regulation or evaluating by incremental experimentation alternative approaches to controlling and reducing

---

**26.** In its Staff Report, the Commission cites its 1983 and 1990 surveys of the District's newsracks, and identifies five alternatives: (1) an outright ban on all newsracks; (2) an outright ban on all newsracks, except those distributing non-"commercial" speech, whose design and placement would be regulated; (3) an outright ban on all newsracks in District residential areas, with design and placement regulations for non-"commercial" newsracks on Charles Street; (4) no outright ban on any newsrack, but general regulation of their size, design, color, location, and attachment; and (5) delaying any District regulation pending the City's decision whether to regulate newsracks city-wide. The Staff Report fails to demonstrate the required "narrow tailoring," for three reasons.

First, the Report was based solely on surveys of *then-existing* newsracks, see Commission Staff Report, at 65 ("None of the distribution box designs can be said to be architecturally appropriate"), and does not consider the feasibility of a different newsrack design more consonant with the desired esthetics. Indeed, the analysis of Alternative # 4 merely states that any such design criteria would have "to be drafted" at some later time. *See id.* at 68. This plainly does not amount to "careful calculation."

Second, the Commission points to no other record evidence that it ever actively considered alternative newsrack design proposals. Even though the Commission now acknowledges that it *failed to send notice* of its November 15, 1990, public hearing to plaintiffs' respective circulation departments, the Staff Report touts the fact that, after years of public opposition to a newsrack ban, plaintiffs had lodged no comments at the public hearing. In a letter to the Commission shortly after the first guideline was promulgated, however, the Boston Globe not only objected to the "notice" provided by the Commission, but reminded the Commission of the Globe's "historical willingness" throughout the preceding eight-year period to negotiate a mutually agreeable newsrack guideline short of a total ban.

Finally, the Report rejects Alternatives 2–4 on the ground that they would tax the Commission's limited enforcement resources. Administrative burden is an appropriate consideration in the "careful calculation" inquiry. Yet even accepting the Commission's uncorroborated reference to its limited administrative resources, it fails because it simply presumes, *sub silentio*, that the expressive activity here involved is somehow due less protection than the anachronous appurtenances the Commission has decided to regulate, but not to ban, and therefore that it is less deserving of individualized treatment under the Commission's *ad hoc* permitting process. Nor does the Report attempt a comprehensive overview of current Commission administrative enforcement expenditures relating to its regulation of these other unhistorical appurtenances.

any visual blight caused by contemporary newsracks. *See Cincinnati,* 507 U.S. at 417, 113 S.Ct. at 1510 (noting that newsrack ban was not a "reasonable fit," since city "failed to address its recently developed concern about newsracks by regulating the size, shape, appearance, or number").

I do not suggest that government invariably must engage in actual experimentation before settling on an outright ban, especially if it can demonstrate that the particular expressive activity creates a serious public nuisance too pressing to countenance delay. Nevertheless, outright bans on protected modes of expressive activity such as newspaper distribution are not entitled to judicial deference absent the required showing that less burdensome alternatives were "carefully calculated." *See Ward,* 491 U.S. at 799, 109 S.Ct. at 2758 (noting that there is no "narrow tailoring" if government "regulate[s] expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals"); *Lakewood,* 486 U.S. at 750, 108 S.Ct. at 2140; *Providence Journal Co. v. City of Newport,* 665 F.Supp. 107, 110 (D.R.I.1987) (collecting cases holding that newsracks are entitled to "full First Amendment protection"); *cf. Vincent,* 466 U.S. at 813, 104 S.Ct. at 2133 (noting that specific locations (utility poles) for posting signs were not traditionally recognized public fora like *public streets* ); *Metromedia,* 453 U.S. at 490, 101 S.Ct. at 2883–84 (upholding outright ban on off-premises billboards carrying less-protected *commercial speech* ). On the other hand, "narrow tailoring" in the present context does not require the government to employ the "least restrictive means," but to demonstrate that it "carefully calculated" the *suitability* of obvious alternatives proportional to its legitimate esthetic objectives. Each case is to be judged on its particular facts, of course, and a total ban might pass muster were it made to appear that the Commission "carefully calculated" less burdensome alternatives and justifiably found them wanting.

The failure to make such a showing is especially flagrant in the present context, since the Commission settled on a total ban because newsracks were unknown in post-colonial times, yet it continues to regulate, rather than prohibit outright, numerous post-colonial appurtenances, without explaining why a newsrack need inevitably be more unbecoming historically and architecturally than a trash receptacle or a streetlight pole. If its response is merely that the trash receptacle or streetlight pole serves a more useful purpose which must somehow be tolerated, then the Commission seriously undervalues both the utility of expressive activity (*i.e.,* newspaper distribution) and the First Amendment protection to which it is entitled. As the failure to demonstrate the required "narrow tailoring" undermines the challenged Street Furniture Guideline under the three-part *Perry* test, I would affirm the district court judgment.