HOP PUBLICATIONS, INC., William Dean Wallace, the Weekly Dig, LLC, and the Improper Publications, Inc., Plaintiffs,

v.

CITY OF BOSTON, Thomas Menino, in his official capacity as Mayor, Antonia M. Pollack, in her capacity as director of the Environment Department, the Back Bay Architectural Commission, Anthony Gordon, in his capacity as Chairman of the Back Bay Architectural Commission, Defendants.

No. CIV.A.01–11536–DPW.

United States District Court, D. Massachusetts.

Aug. 27, 2004.

Krisna M. Basu, Swampscott, MA, for City of Boston, The Back Bay Architectural Commission, Anthony Gordon, Antonia M. Pollack, Michael J. Galvin, Thomas Menino, Defendants.

Mark W. Batten, Proskauer Rose LLP, Boston, MA, for HOP Publications, Inc., Improper Publications, Inc., The Weekly Dig, LLC, William Dean Wallace, Plaintiffs.

William T. Cuttle, City of Boston Law Department, Boston, MA, for City of Boston, Defendant.

John Devereaux, Office of John R. Devereaux, Boston, MA, for Back Bay Association, Commonwealth Avenue Mall Committee, Friends of Coply Square, Friends of the Public Garden and Common, Inc., Garden Club of The Back Bay, Neighborhood Association of The Back Bay, Beacon Hill Civil Association, Interested Parties.

James C. Heigham, Choate, Hall & Stewart, Boston, MA, for Massachusetts Newspaper Publishers Association, Interested Party.

John Reinstein, America Civil Liberties Union of Massachusetts, Boston, MA, for Boston Phoenix, Inc. The, Stuff Magazine, LLC, The Real Estate Guide, Inc., Plaintiffs.

John G. Swomley, Swomley & Associates, Boston, MA, for HOP Publications, Inc., The Weekly Dig, LLC, William Dean Wallace, Improper Publications, Inc., Boston Phoenix, Inc. The, Stuff Magazine, LLC, The Real Estate Guide, Inc., Plaintiffs.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

Several newspaper publishers challenge a local ordinance that prohibits the use of newsracks in Boston's Back Bay Architectural District (the "District"). The prohibition is part of an urban planning initiative by which the City of Boston, having successfully banned newsracks from Beacon Hill, now seeks to restrict further the areas of the City in which newsracks may

be used to distribute periodicals. Plaintiffs contend that the ordinance violates their First Amendment rights because, by imposing a flat ban of all newsracks, it is not narrowly tailored to serve defendants' interest in maintaining the aesthetics of the District. Plaintiffs further contend that the ordinance violates their free speech rights because it does not provide economically feasible alternative means of distribution within the District. After considering the evidence offered during a bench trial, I conclude that the ordinance does not violate the First Amendment, and accordingly, I will direct judgment enter for defendants. The following constitute my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## I. FINDINGS OF FACT

### A. The Commission and its District

Boston's Back Bay has been listed in the National Register of Historic Places as a National Register District since 1973. This listing signifies designation of the Back Bay by the Department of the Interior of the United States, through the State Historic Preservation Offices, as an area of local, state, or national significance.

The District is a roughly rectangular area whose geographic boundaries extend south from the Charles River to Boylston Street and west from the Boston Public Garden to the eastern approaches of Kenmore Square.[1]

Defendant Back Bay Architectural Commission (the "Commission") was established in 1966 by statute for the following purposes:

(a) to promote the economic, cultural, educational and general welfare of the public through high standards of design throughout the Back Bay and through the preservation of the residential portion of the Back Bay area in the City of Boston;

(b) to safeguard the heritage of the City of Boston by preventing the despoliation of a district in that city which reflects important elements of its cultural, social, economic and political history;

(c) to stabilize and strengthen residential property values in such areas;

(d) to foster civic beauty; and

(e) to strengthen the economy of the Commonwealth and the City of Boston.

1966 Mass. Acts ch. 625 as amended by 1981 Mass. Acts Ch. 624.

The Commission is the urban planning heir to "the Commissioners on Public Land in the Back Bay [who] imposed some amazingly sophisticated controls on all

---

1. The Massachusetts legislature has established the precise boundaries of the District as follows:

starting at the intersection of the center line of Newbury Street and the center line of Charlesgate East; thence running northerly by the center line of Charlesgate East to the center line of Back Street to the center line of Embankment Road; thence running southerly by the center line of Embankment Road to the center line of Beacon Street; thence running easterly along the center line Beacon Street to the center line of Arlington Street; thence running southerly along the center line of Arlington Street to the center line of Boylston Street; thence running westerly by the center line of Boylston Street to the center line of Massachusetts Avenue; thence running northerly by the center line of Massachusetts Avenue to the center line of Newbury Street; thence running westerly along the center line of Newbury Street to the point of the beginning.

1966 Mass. Acts ch. 625 as amended by 1979 Mass. Acts ch. 645.

It should be noted that the southern side of Boylston Street is consequently not within the District.

owners through the deeds to the land" as the Back Bay was laid out and developed in the later half of the nineteenth century.[2] Robert Campbell & Peter Vanderwarker, *Cityscapes of Boston: An American City Through Time* 80 (1992). The result of the original "commissioners' wise controls," Campbell and Vanderwarker report, was "a sense of public consensus" by which "[t]he Back Bay creates a public realm without stinting the right of personal self expression." *Id.* For those commentators, the outcome is "an architecture that expresses the best of America." *Id.* The enactment of the legislation creating the Back Bay Architectural Commission was designed, according to the then-Administrator of the Boston Redevelopment Authority, to "help to insure that all new construction and alterations in the Back Bay residential area will be in keeping with the area's distinctive architectural character." Boston Redevelopment Authority, *Seven Years of Progress: A Final Report by Edward J. Logue* 32 (1967).

## B.   The Street Furniture Guideline

In February, 1990, the Commission, through the City of Boston Environment Department (the "Environment Department"), issued "Guidelines for the Residential District" of Back Bay. A section of the guidelines entitled "Public Areas" specifically implicated newsracks.[3]   It stated:

> STREET FURNITURE.   Miscellaneous public street furniture such as traffic light boxes, vending machines, newspaper boxes, trash receptacles, mail boxes, and telephone panels and booths, poles, meters, etc., are subject to commission review and shall be appropriate in scale and design.

In 1996, the Boston City Council adopted an ordinance regulating newsracks for the city of Boston as a whole.   In adopting the ordinance, the City Council noted a number of problems associated with the physical placement of newsracks on the sidewalks,[4] and it additionally noted several aesthetic concerns:

> [N]ewsracks are often not properly maintained and are allowed to deteriorate, and fall into states of disrepair in which newsracks collect trash and other debris, become covered with graffiti, are tipped over, cause damage to curb, sidewalk, and street material, pole traffic signal and signs, and/or remain empty or abandoned.

The 1996 ordinance called for newsrack owners to register the placement and

---

2.   The filling and development of Back Bay is chronicled in Walter Muir Whitehill, *Boston: A Topographical History* 141–173 (2d ed., enlarged, 1968) and in Nancy S. Seasholes, *Gaining Ground: A History of Landmarking In Boston* 153–210 (2003).   Seasholes observes that Back Bay was "probably so-named because it was a bay in the Charles River estuary on the backside of Boston Neck," *id.* at 153, the original connection between Boston and the mainland, before it was filled.

3.   Newsracks or newsboxes may be defined as freestanding, unattended vending boxes used to hold newspapers, magazines, and periodicals, whether for free or for charge.

4.   The Council noted that:

scattered newsracks in Boston often block crosswalks and handicap ramps, unreasonably impede access for the use and maintenance of the pole, posts, traffic signs or signals, hydrants and mailboxes, unreasonably obstruct the flow of pedestrian and vehicular traffic, unreasonably obstruct access to bus stops, taxi cab stands, valet parking areas, loading zones and fire lanes, impede emergency snow removal operations, create undue nuisances and hazards to passers by in bad weather and storms and otherwise unreasonably reduce the useable width of sidewalks, streets, and alleys, thereby unreasonably restricting public access and creating undue perils and public safety hazards.

maintenance of the boxes with the city and comply with certain requirements regarding the placement and maintenance of the boxes.

On March 22, 2000, the Neighborhood Association of the Back Bay ("NABB"), petitioned the Commission to ban newsracks from the District. The Commission held a public hearing on the issue on April 12, 2000. In support of a newsrack ban, NABB submitted a letter citing the proliferation of newsracks in the District, which it viewed as a visual blight that detracted from the architectural and historical dimensions to the District. It stated that "no structure on the sidewalk, no matter how tastefully designed can overcome the visual clutter that the accumulation of such structures constitute." The NABB letter further stated its view that any regulation short of an outright ban would be inadequate to address the problem given the failure of the existing guidelines to adequately regulate newsrack use. It stated that "[s]ince the implementation of the city's regulation, newsracks have increased in number with more of the plastic containers in even more garish colors occupying the sidewalks. The problem of graffiti and newsracks being used as trash receptacles continues unabated." The NABB supplemented these concerns with information about the number and types of newsracks in the District, as well as with photographs.

NABB submitted a second petition to ban newsracks on November 29, 2000. This petition, signed by merchants from Newbury Street within the District, reiterated concerns about newsracks and offered additional photographs of the alleged unsightliness of the newsracks.

On April 11, 2001, the Commission held a second public hearing, at which NABB presented additional reports and information to the Commission about the number and appearance of newsracks in the District. At the hearing, publishers of newspapers, neighborhood groups, politicians, and members of the Commission expressed their views about the constitutionality of a ban on newsracks, the appearance of newsracks in the District, other outlets available for distribution of newspapers within the District, and the efficacy of existing regulations to limit newsrack use in the District.

On May 9, 2001, the Commission met at a public hearing and adopted a Street Furniture Guideline to go into effect on August 9, 2001. The guideline stated:

Street furniture, as defined below, shall not be permitted within the Back Bay Architectural District with the exception of those structures erected or placed by authorized public agencies for public safety and/or public welfare purposes. Street furniture is defined as any structure erected or placed in the public or private way on a temporary or permanent basis. Authorized public safety/public welfare. street furniture includes, but is not limited to, such structures as street lights, traffic lights, mail boxes, fire hydrants, street trees, trash receptacles, and such elements of the City of Boston Street Furniture Program as the commission may approve hereafter.

Any such authorized public safety/public welfare street furniture, including elements of the City of Boston Street Furniture Program, shall be subject to commission review and shall be in keeping with the architectural character of the district and the criteria for exterior architectural features as specified in Ch. 625 of the Acts of 1966, as amended.

On November 28, 2001, the Commission held another public meeting to consider the Street Furniture Guideline. Plaintiffs received prior notice of this meeting from the Environment Department, and various publishers and residents had the opportu-

nity to speak both for and against the proposed guideline. The Commission adopted a second version of the Street Furniture Guideline (the "Guideline") which was identical to the Street Furniture Guideline adopted on May 9, 2001, except that it contained an exception for outdoor restaurant furniture in the first sentence.[5]

In its answer to interrogatories in this litigation, the Commission stated that it adopted the Guideline because "after due consideration, it determined that it was in keeping with the purposes of the [Commission] and the protection of the historic Back Bay Architectural District." Additionally, William Young, the executive secretary of the Commission testified that the Guideline was "adopted to address the proliferation of these features in the district which were regarded as a visual blight on the architectural character of the district," and he cited to the growing number of newsracks in the District as described in the NABB letters.

The Commission cited three specific aesthetic concerns that motivated adopting the Guideline:

(a) newsracks are often painted bright colors that are out of keeping with the muted tones of the Back Bay District;

(b) they sometimes are manufactured from plastic or other materials that the Committee considers not "durable"; and

(c) they are often clustered together, with the differing colors creating a "visual jumble."

## C. The Newspapers

Plaintiff organizations are three newspaper publishers incorporated in Massachusetts with their principal places of business in or near Boston.[6] Plaintiff HOP Publications, Inc. ("HOP") publishes and distributes the newspaper *Editorial Humor;*[7] plaintiff The Weekly Dig, LLC ("Weekly Dig") publishes the newspaper *Boston's Weekly Dig;*[8] and plaintiff Improper Publications, Inc. ("Improper") publishes a newspaper, *The Improper Bostonian.*[9] The sole individual plaintiff, William Dean Wallace, Jr., is the Chief Executive Officer of HOP and the Publisher of *Editorial Humor.*

### (1) *Newsrack Distribution in the District*

The three newspaper plaintiffs claim that a substantial portion of their target

---

**5.** Thus, the first sentence of the revised guideline stated:

> Street furniture, as defined below, shall not be permitted within the Back Bay Architectural District with the exception of *outdoor restaurant furniture* and those structures erected or placed by authorized public agencies for public safety and/or public welfare purposes.

(Emphasis added). The remainder of the May 9 and November 29 guidelines were identical.

**6.** Three additional publishers, the Real Estate Guide, Inc., The Boston Phoenix, LLC, and Stuff Magazine, LLC, originally joined in bringing this suit but were dismissed by stipulation prior to trial.

**7.** *Editorial Humor* has been published since 1989. It is published bi-weekly and follows

world, national, and local news through the eyes of professional editorial cartoonists. It sells for fifty cents, but is distributed for free in certain locations. In his testimony, Wallace stated that he expected the January 30, 2002 edition of *Editorial Humor* to be the last issue. No evidence was presented as to whether this was actually the case.

**8.** *Boston's Weekly Dig* was first published in 1999. It covers alternative entertainment, social issues, and subculture. It is published once a week, as its name suggests, and it is free.

**9.** *The Improper Bostonian*, which began publication in 1991, is a bi-weekly magazine guide to entertainment, arts, dining, and culture in the metropolitan Boston area.

reader population lives in or passes through the District.[10] For example, the Weekly Dig considers the Back Bay to be one of its top three locations in greater Boston, and Improper considers the Back Bay, along with the Beacon Hill area of Boston, to be its "footprint."

All three plaintiff publishers use newsracks to distribute their newspapers in the District. HOP, which began using newsracks in 1991, distributes *Editorial Humor* almost exclusively (99.9%) by vending newsracks[11] in the District and in Boston generally, except for its distribution at colleges and universities in Boston.[12] HOP has between 19 and 24 newsracks in the commercial areas of the District, out of a total of 389 it maintains throughout the greater Boston area.

Weekly Dig began using newsracks for distribution shortly after it began publication in 1999. It maintains approximately 100 newsracks in the greater Boston area. Of those, between 60 and 70 are within the city limits, and between three and five are inside the District.[13] Approximately 51% of *Boston's Weekly Dig*'s distribution in the District is out of newsracks, with the remainder through placement in stores.[14]

*The Improper Bostonian* also began using newsracks soon after beginning publi-

cation. It has between 14 and 20 newsracks in the District, out of 151 total newsracks in use.[15] About 50 to 55% of distribution of *The Improper Bostonian* is through newsboxes, 25% is through store placement, and the remainder is through home delivery.

### (2) *Other Modes of Distribution*

HOP has in the past used a number of different modes of distribution, both inside and outside the District. It used street vendors during *Editorial Humor*'s first three years, but eventually, as a result of a business decision, discontinued that method. It distributed via home delivery between 1991 and 1993 but deemed those efforts unsuccessful and discontinued that service. Outside of the District, about 50% of *Editorial Humor*'s distribution is by placement at stores for free. HOP also used store placement of papers in the District, but in around 1999 it decided, again as a business decision, to discontinue such placement in favor of using newsracks, through which 99.9% of its distribution in the District is accomplished. Additionally, *Editorial Humor* is available through a paid, mailed subscription,[16] and HOP maintains an Internet site.

10. *Editorial Humor* describes its target demographic as intelligent, sophisticated, educated adults. *Boston's Weekly Dig* targets college students and young adults and considers its core audience to be between the ages 18 and 34. *The Improper Bostonian* targets readers that are young and have a median yearly household income of at least $75,000.

11. The newsracks vend *Editorial Humor* for 50 cents a copy.

12. For example, 400–500 free copies of each issue are distributed at Boston University's student union.

13. Plaintiffs claim there are seven such newsracks in the District; however, it appears two

of these are at locations that abut the District but are outside its official boundaries.

14. For each issue, approximately 850 copies of the newspaper are distributed through newsracks in the District while approximately 820 are distributed through store placement in the District.

15. Plaintiffs originally claimed 36 such newsrack locations in the District, however it appears 14 of these are at locations that abut, but are not within, the District.

16. This method, however, accounts for less than 1% of total distribution.

In the greater Boston area, *Boston's Weekly Dig* is distributed in approximately 400 commercial locations. Of these, approximately 100 are distributed from interior newsracks, and the remainder are typically placed on counters or other locations inside the store. The Weekly Dig also maintains a website.

The distribution breakdown for *The Improper Bostonian* throughout the greater Boston area, which in total is done at 600 locations, is similar to its distribution pattern within the District: approximately 50% of the distribution of *The Improper Bostonian* is through newsboxes, approximately 25% is through indoor newsracks; and approximately 25% is through home delivery. *The Improper Bostonian* is delivered to every home in the Back Bay.

Store placement varies from location to location and is different from newsrack distribution in at least three respects. First, while some stores will carry the newspapers for free, some charge a fee. Moreover, some stores, due to content or other reasons, will not agree to carry certain newspapers at all. Second, the placement of newspapers in stores sometimes is in an undesirable location such as far from the register or on shelves close to the ground, where they could get covered up. Third, some stores limit the number of copies of a newspaper they will carry, potentially making distribution at a store location significantly smaller than out of a newsrack.

Finally, all three plaintiff publishers maintain newsracks near the perimeter of the District. In fact, one of the factual disputes in the case, not necessary for resolution, concerns which newsracks lie inside the District and which abut but are not inside it. For example, newsracks on the southern side of Boylston Street are not in the District and hence not subject to the Guideline while those on the opposite side of the street are.[17]

## II. CONCLUSIONS OF LAW

Because the First Circuit, in *Globe Newspaper Co. v. Beacon Hill Architectural Commission*, 100 F.3d 175 (1st Cir. 1996), considered claims very similar to plaintiffs' claims here, the legal groundwork for this case is solidly in place and the legal issues presented are fairly circumscribed.

In *Globe*, the court rejected a First Amendment-based challenge brought by several major local and national newspapers to a guideline that was nearly identical in language to the Guideline, except that it applied to the Beacon Hill area of Boston.[18] The court determined that because the Beacon Hill guideline affected a traditional public forum (public sidewalks) and constituted a content-neutral restriction on the time, place, and manner of expression, *id.* at 182–83, intermediate scrutiny was the appropriate standard: the guideline would only be upheld if it

17. Prior to September 1, 2001, the date the Guideline was to go into effect, Improper apparently moved approximately 8–10 newsracks across Boylston Street to comply with the Guideline. Although the parties agreed that the Guideline would not be enforced pending the litigation, Improper did not immediately move the newsracks back across the street.

18. There are several minor differences between the ordinances. For example, while the Beacon Hill guideline made an exception for "approved store-front merchandise stands," the Guideline made an exception for "approved outdoor restaurant furniture." *See Globe,* 100 F.3d at 181. However, the parties agree that neither this difference nor any other difference between the guidelines is relevant to the present discussion. I agree and treat the guidelines as substantively identical for purposes of this trial.

was "narrowly tailored to serve a significant governmental interest, and allow for reasonable alternative channels of communication." *Id.* at 186.

The court ultimately held that the Beacon Hill Commission's aesthetic interest in preserving the district's architectural and historic character served a "significant government interest," *id.* at 187, and it additionally found that the guideline was both narrowly tailored and allowed for sufficient alternative modes of distribution for the plaintiff publishers. *Id.* at 192, 194.

Plaintiffs here do not dispute that *Globe* is controlling insofar as it requires the application of intermediate scrutiny and to the extent that it held aesthetic interests like those of defendants here are significant government interests. Plaintiffs contend, however, that the Guideline nevertheless fails to pass constitutional muster because it is neither narrowly tailored nor does it allow for adequate alternative means for them to distribute their newspapers.

Plaintiffs argue that while the Guideline is essentially identical to the guideline upheld in *Globe,* it is unconstitutional for two reasons. First, they contend that, unlike in *Globe,* there is no evidence here that the Commission made any effort to determine whether any alternatives to the flat ban on newsracks imposed by the Guideline would effectively address the Commission's stated aesthetic concerns. Plaintiffs claim that because a guideline involving a case-by-case determination would be adequate to address the aesthetic concerns, the Guideline is not narrowly tailored. Second, plaintiffs attempt to distinguish *Globe* on the basis of differences between their businesses and those of the plaintiffs in *Globe.* They claim that, unlike in *Globe,* because their newspapers are distributed primarily by newsrack in the District and alternative means of distribution are pro-

hibitively expensive for them given their economic resources, the Guideline does not allow for reasonable alternative channels of communication. I discuss these contentions in turn.

## A. Narrowly Tailored

■ As *Globe* made clear, to be sufficiently narrowly tailored, a content-neutral regulation need not pass a "least restrictive means analysis." 100 F.3d at 188. Rather, a regulation meets the narrowly tailored requirement "so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation," *id.* at 188 (quoting *Nat'l Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 744 (1st Cir.1995)), and it "does not burden 'substantially more' speech than is necessary to further the government interest." *Globe,* 100 F.3d at 188 (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 799, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)).

■ Plaintiffs argue that satisfaction of the Commission's stated aesthetic concerns—color, material, and durability—could have been effectively addressed by a regulation under which the Commission authorized newsrack use on a case-by-case basis. The Commission, they contend, could have considered whether a particular proposed newsrack sufficiently fit within its desired aesthetic scheme and approved (or disapproved) of it accordingly, much like it does with other street objects under the Guideline. Thus, plaintiffs conclude that the Guideline burdens substantially more speech than is necessary to meet the Commission's aesthetic aims. I disagree.

In *Globe,* the court held that the Beacon Hill guideline did not burden substantially more speech than necessary because it did "not burden, or otherwise adversely affect, any other means of distribution, including

the use of street vendors in the public forum." 100 F.3d at 189. In other words, the court found that the guideline was narrowly tailored because, at least on its face, it did not directly affect any alternative modes of distribution.[19] In arriving at this conclusion, the *Globe* court overturned the district court's holding which was based on reasoning similar to that of plaintiffs: that the Beacon Hill guideline was not narrowly tailored because of the existence of a less burdensome alternative. The *Globe* court noted that while the existence of "numerous and obvious less-burdensome alternatives" is "certainly *a* relevant consideration ... it is not necessarily a controlling one." *Id.* at 190. The court further stated:

> [W]e are mindful of the district court's "findings" that the Commission's interest could be met by, say, "subjecting newsracks and other street furniture to the same review process as store-front merchandise racks," and that it treats some "street furniture" with "preference." Unlike the district court, however, we do not conclude that such findings compel a determination—at least in this case—that the Street Furniture Guideline burdens "substantially more" speech than is necessary to accomplish its purpose and, thus, is not narrowly tailored.

*Id.* at 189.

In its ultimate analysis, the *Globe* court deferred substantially to the Beacon Hill Commission's decision, stating that a court's opinion as to the best regulation is not crucial to the substantial burden inquiry:

> [T]he regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. "The validity of

[time, place, and manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests" or the degree to which those interests should be promoted.

*Id.* at 190 (quoting *Ward,* 491 U.S. at 800, 109 S.Ct. 2746).

Plaintiffs, however, point out that the *Globe* court did not merely rely on the Beacon Hill Commission's subjective judgment but rather based its determination on evidence that the Beacon Hill Commission "carefully calculated the costs and benefits" associated with the burden on speech imposed by the street furniture guideline. *Id.* For example, in refusing to consider the availability of less-burdensome alternatives determinative, the court relied, in large part, on the Beacon Hill Commission's written report, which showed that it had considered five available alternatives to the then-proposed guideline but had concluded they would not be as effective as a complete ban. *Id.* at 188–89. Plaintiffs contend that *Globe* is distinguishable because here, unlike in *Globe,* the Back Bay Commission has not sufficiently made a showing that it adequately considered whether alternatives to the Guideline could achieve its aesthetic concerns as effectively as an outright ban.

While the Back Bay Commission did not issue a written report detailing its consideration of solutions to its aesthetic concerns with newsracks, the factual history leading to the enactment of the Guideline indicates that the Commission adopted the Guideline with due consideration of alternatives. Perceived problems posed by newsracks in the area are longstanding. Newsracks have been in the heartland of

---

**19.** This, of course, is quite distinct from whether other modes would, from an eco- nomic standpoint, be feasible for plaintiffs, which I consider in § II.B, *infra.*

the Commission's radar screen since at least 1990, when it passed the first street furniture guideline. Aesthetic concerns about newsracks were specifically noted in the Boston City Council's report associated with the 1996 city ordinance. Indeed, the Beacon Hill guideline at issue in *Globe,* which is nearly identical to the Guideline at issue here, was enacted in 1991 and evaluated by the *Globe* court in 1996. Most recently, the petition by NABB raised issues about the aesthetic problems associated with newsracks in the District.

The NABB submitted two petitions that contained detailed information about news-racks in the District, including photographs. In response to the petitions, the Commission held three public hearings over the course of a year and a half, taking in the perspectives of both those for and those against a newsrack ban, before adopting the Guideline in its present form.

Thus, while the Commission itself never issued a written statement recounting in detail its deliberations, it is quite clear that it did not pull the Guideline out of thin air. Rather, the evidence demonstrates that the Commission, aware of alternatives both in the form of the 1990 and 1996 regulations and as presented at the public hearings, adopted the Guideline as what it believed to be the most effective solution to the perceived problem with newsracks. Moreover, while the Commission did not implement or experiment with other alternatives before finally choosing the Guideline, such trials are not required under *Globe. See* 100 F.3d at 189 n. 15.

Plaintiffs' citation of *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993), in support its contention that the Commissions adoption of the Guideline was not carefully considered is misplaced. In *Discovery Network,* the Supreme Court struck down a newsrack ordinance it deemed not

sufficiently narrowly tailored. The Court stated there that:

> [t]he fact that the city failed to address its recently developed concern about newsracks by regulating their size, shape, appearance, or number indicates that it has not "carefully calculated" the costs and benefits associated with the burden on speech imposed by its prohibition.

*Id.* at 417, 113 S.Ct. 1505. The ordinance at issue in *Discovery Network,* however, was an "outdated prohibition against the distribution of any commercial handbills on public property," *id.* at 417, 113 S.Ct. 1505, that city officials used to revoke permits to use newsracks. The Court's conclusion thus rested on what it found to be a substantial nonfit between the city's interests—safety and aesthetics—and the handbill ordinance, which had been enacted long before any concern about newsracks developed and was originally directed at littering. *Id.* Here, in contrast, the Guideline is a direct effort to address the contemporaneous problem of newsracks.

In sum, I find that plaintiffs' attempts to dissect the Commission's stated concerns about particular features of newsracks obscures the broader picture, which depicts a sufficiently careful consideration of alternatives by the Commission in adopting the Guideline. In *Globe,* the court stated:

> Where aesthetic interests are at play, the challenged regulation must be judged by overall context: the government must show that the regulation of the feature at issue "would have more than a negligible impact on aesthetics," which generally requires that the government be making a *bona fide* or "comprehensive coordinated effort" to address aesthetic concerns in the affected community.

100 F.3d at 188 (quoting *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 531, 101

S.Ct. 2882, 69 L.Ed.2d 800 (1981)). Considering the overall context in this case, I find that the Guideline is sufficiently narrowly tailored.

## B. Alternative Modes of Distribution

Plaintiffs contend that the Guideline does not provide reasonable alternative channels of communication because potential means of distribution other than by newsrack—street vending, store placement, mail, and home delivery—are prohibitively expensive. I first consider street vendors, because they are the only means of distribution discussed that would operate in the exact same forum as newsracks, before turning to a consideration of other alternative distribution methods.

### (1) Street Vendors

In *Globe,* the court held that the Beacon Hill guideline allowed for adequate alternatives because it did not "affect the Newspapers' freedom to exercise their right to distribute publications through street vendors in the very public forum— the [Beacon Hill] District's sidewalks— from which the newsracks are banned." 100 F.3d at 193. In reaching this holding, the court rejected the plaintiff publishers' argument, similar to plaintiffs' argument here, that distribution by street vendors was not a reasonable alternative to the use of newsracks because the former was more expensive than the latter. *Id.*

Plaintiffs attempt to distinguish *Globe* on its facts. They point out that the *Globe* court noted "the [plaintiff newspapers'] claim that street vendors are not a practical alternative is belied by the record," especially for two of the plaintiff newspapers whose sales by street vendors exceeded sales by newsracks, and that newsracks accounted for a small percentage of the

plaintiff newspapers' total distribution in *Globe. Id.* at 193–94. Plaintiffs contend that here, in contrast, distribution by newsrack is a substantial mode of distribution of their newspapers in the District— and for HOP essentially the exclusive mode. Moreover, plaintiffs note that none of them use street vendors either inside or outside the District.

As an initial matter, *Globe*'s discussion of the lack of factual support in the record of any cost disparity between street vendors and newsracks is dicta. Prior to that discussion, the court noted that "[t]he First Amendment does not guarantee a right to the most cost-effective means of distribution or the rent-free use of public property." *Id.* More important for present purposes, the court stated that "[i]n reaching this conclusion [that the newsrack ban provided adequate alternatives] we reject as *essentially irrelevant* the contention that the cost of street vendors, let alone 24–hour street vending, is substantially more costly than placing a stationary newsrack." *Id.* (emphasis added). Thus, plaintiffs' arguments based on differences between the cost of newsracks and street vendors, are, as a matter of law, inconsequential under *Globe.*

■ In any event, I find that plaintiffs have not factually demonstrated that the cost of street vendors is prohibitively expensive. While the record shows that in the early years of *Editorial Humor,* HOP stopped using street vendors based on a business decision and that none of plaintiffs presently use street vendors for distribution either inside or outside of the District, this evidence at best supports the inference that using newsracks is more profitable than using street vendors.[20] It

---

20. I note, however, that the evidence does not necessarily lead to such an inference, as the

decision not to use street vendors could be based on a number of factors unrelated to

does not support the further inference, pressed by plaintiffs, that use of street vendors in the District would not be profitable, and more importantly, it is not a sufficient factual basis for the conclusion that street vendors are prohibitively expensive for plaintiffs' businesses as a whole.

In short, plaintiffs have failed to adduce any meaningful evidence of the cost of using street vendors in the District, much less show how such cost compares to the cost of installing and maintaining newsracks there. Evidence about the general nature of the plaintiffs' newspapers—for example, that two of them are free—or conclusory comparisons between the newspapers and the *Globe* plaintiffs' newspapers add little in this regard. *See Globe,* 100 F.3d at 194 ("[A]bsent any record evidence regarding the feasibility or infeasibility of street vending for free publications ... we are particularly reluctant to treat free publications differently than those 'for charge,' or to otherwise alter our conclusion."). Thus, I conclude that the Guideline provides reasonable alternative channels of communication within the District through street vendors.

(2) *Additional Alternative Distribution Means*

■ Although, I need not delve further, having determined that this case is not factually distinguishable from *Globe* in any legally significant way, I nevertheless find it worthwhile to explore several additional issues mentioned but not reached in *Globe.* The *Globe* court noted several potential factors, such as the availability of distribution through store placement or home de-

livery, that might impact the reasonable alternatives inquiry. 100 F.3d at 192–93. However, the court ultimately concluded that the Beacon Hill guideline provided adequate alternative means of distribution

> without relying on the other current means of distribution within the District, the numerous private sources both within and without the District, or the proximity of newsracks outside the District.

*Globe,* 100 F.3d at 193. It explicitly left open the question of whether such considerations are even relevant to the inquiry. *Id.* To the extent such considerations are relevant, I find that they favor defendants in this case.

While it is clear that newsracks account for a substantial proportion of distribution for plaintiffs' newspapers in the District, the evidence plainly demonstrates that plaintiffs use other means of distribution both inside and outside the District. About half *The Improper Bostonian*'s and *Boston's Weekly Dig*'s distribution in the District is done through store placement and home delivery, and while newsracks account for over 99% of the distribution of *Editorial Humor* in the District, HOP uses store placement for about 50% of its distribution outside the District.[21] Moreover, HOP has in the past used both street vendors and home delivery, even though it presently does not use those modes of distribution.

Plaintiffs contend that the streets in the District provide special access to the core of their readers. However, while the Weekly Dig claims it considers the Back Bay one of its top three locations in greater Boston and *The Improper Bostonian*

cost or profit, such as the lack of infrastructure needed to employ street vendors.

**21.** Additionally, the evidence indicates that HOP and the Weekly Dig maintain websites. However, because the evidence does not

make clear whether the entire content of the newspapers can be read online, I do not consider the Internet as a possible alternative source of distribution.

refers to Back Bay and Beacon Hill as its "footprint," plaintiffs have not offered any evidence indicating that streets in the District—or more specifically, newsracks in the District—provide an irreplaceable source of distribution. As the court noted in *Globe:*

> [T]here is nothing in the record to suggest, let alone show, that the newsracks within the District fulfill a unique distribution need which is not currently satisfied by other means of distribution and which could not be satisfied by a street vendor.

100 F.3d at 194. I find the same to be true in this case.[22]

Additionally, I note that plaintiffs' contention that the District generally, and newsracks in the District specifically, provide special access to readers of plaintiffs' newspapers is belied factually by the number of newsracks plaintiffs maintain in the District. Only between 36 and 49 of the 640 total newsracks plaintiffs use in the greater Boston area are in the District. This means that, by admittedly rough calculations, only about five to eight percent of plaintiffs' total distribution comes through newsracks in the District. Needless to say, this is far from the bulk of plaintiffs' customer base.[23]

HOP argues that because *Editorial Humor* is a "visual paper" consisting of political cartoons, it is usually bought as an "impulse purchase" by one who ordinarily does not seek it out but whose attention is captured by the cover. *Globe* considered this argument as well albeit in a slightly different form. The plaintiffs in *Globe* argued that newsracks provided unique access to what the court described as the "accidental reader" who passes through the area and prefers single-copy sales. *Id.* In response, the court stated that "[a]lthough the regulation may frustrate the preferences of these readers, 'thwarting ... an idiosyncratic [or not so idiosyncratic] preference cannot be equated with a denial of adequate avenues of communication.'" *Id.* (quoting *Nat'l Amusements,* 43 F.3d at 745). Moreover, HOP's starting premise that its general readership consists mostly of impulse buyers on the streets is undermined by the fact that half of *Editorial Humor*'s total distribution is through store placement, and HOP has not made any showing that readers of *Editorial Humor* in the District are more likely to be impulse buyers or accidental readers than its general readership.

Plaintiffs additionally argue that newsracks can hold many more copies of their newspapers than any store or restaurant

---

22. In this regard, the Supreme Court's decision in *City of Ladue v. Gilleo,* 512 U.S. 43, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994), is inapposite. There, the Court struck down a local ordinance regulating the display of certain types of signs on personal property. The Court found that the ordinance did not "leave open ample alternative channels for communications" because of the unique nature of the regulated signs:

> Displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means. Precisely because of their location,

such signs provide information about the identity of the "speaker."

*Id.* at 56, 114 S.Ct. 2038. Plaintiffs have made no showing that distribution by newsracks in the District is similarly unique.

23. The small percentage of total distribution accounted for by newsracks in the District also undercuts, to some extent, plaintiffs' claims that alternative means like street vendors or home delivery are prohibitively expensive for the company as a whole. While use of alternative means might be more costly than using newsracks in the District, plaintiffs have not adduced evidence demonstrating how such an increase in cost would mean financial doom for their companies.

would typically carry. Even if this is true, this means at most that the loss of one newsrack cannot adequately be replaced by placement at one store location; it does not mean that the loss of newsracks generally cannot be adequately replaced by store placement or home delivery generally. In any event, even assuming the loss of newsracks necessarily results in a decline in distribution numbers, such a result does not by itself invalidate the Guideline. Indeed, "some diminution in the overall quantity of speech will be tolerated." *Globe,* 100 F.3d at 194 (quoting *Nat'l Amusements,* 43 F.3d at 745). Plaintiffs have not made a sufficient showing that any diminution caused by the more limited distribution per store as compared to per newsrack will be substantial.

Finally, while perhaps of little probative value given the scant evidentiary development of the issue by the parties, I note that there are at least some areas of the District close to, or even abutting, areas with newsracks. For example, while the northern, odd-numbered side of Boylston Street is within the official boundaries of the District, the opposite side of the street is not, and it is undisputed that *The Improper Bostonian* maintained newsracks on the latter for at least some period recently. Although the First Circuit explicitly declined to decide whether the existence of newsracks in surrounding areas is an appropriate consideration in assessing reasonable alternatives, *see Globe,* 100 F.3d at 193 n. 23 (noting that some courts have held that it is not), the Sixth Circuit explicitly relied on such a consideration in upholding an absolute ban on newsracks in residential areas. *Plain Dealer Publ'g Co. v. City of Lakewood,* 794 F.2d 1139, 1147 (6th Cir.1986), *aff'd in part on other grounds,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988).[24] I view such circumstances as relevant to the mix of evidence to be considered when evaluating the availability of reasonable alternatives within the District, and I find that the presence of newsracks in the general vicinity of the District adds further force to my conclusion that the Guideline allows for adequate alternative means of distribution.

### (3) Conclusion

Because I find that plaintiffs have not sufficiently shown the unavailability or infeasibility of either street vendors or, to the extent they are relevant to the inquiry, other sources both within and outside the District as alternatives to newsracks in the District, I find that the Guideline provides reasonable alternative means of distribution for plaintiffs' newspapers. The reasonable alternatives inquiry focuses not on whether "a degree of curtailment exists" as a result of the Guideline—which I find is the case—but rather on whether the Guideline leaves open adequate channels of communication. *Globe,* 100 F.3d at 193. Thus, while the Guideline forces plaintiffs to use distribution means in the District which they find economically unappealing or that they would otherwise not use, this does not change the fact that alternatives to newsracks in the District are available to plaintiffs, and plaintiffs have not sufficiently demonstrated that such alternatives are not adequate. Accordingly, I

---

**24.** In *Plain Dealer,* although it upheld an ordinance banning newsracks in residential areas, the Sixth Circuit held that the ordinance was unconstitutional as to its ban of commercial districts because it gave the mayor and the architectural board unbounded discretion to deny newsrack permit applications and because the ordinance imposed an insurance indemnity requirement on newsrack owners but not on owners of other structures. 794 F.2d at 1145–47. The Supreme Court affirmed the decision as to commercial districts; the Sixth Circuit's ruling as to residential areas was not appealed.

conclude that the Guideline does not violate plaintiffs' First Amendment rights.

## III. ORDER FOR JUDGMENT

For the foregoing reasons, it is hereby ORDERED that judgment enter for defendants.